ATLANTIC RICHFIELD COMPANY, a foreign corporation, Plaintiff-Appellee Cross-Appellant,

v.

GOOD HOPE REFINERIES, INC., as Claimant Owner of 30,000 Tons of Oil, Defendant-Appellant Cross-Appellee,

and

Peerless Insurance Company, Movant-Appellant Cross-Appellee.

No. 77–1909.

United States Court of Appeals, Fifth Circuit.

Oct. 16, 1979.

Frank J. Marston, Miami, Fla., for defendant-appellant cross-appellee.

Mercer K. Clarke, Miami, Fla., for plaintiff-appellee cross-appellant.

Before GODBOLD, Circuit Judge, SKELTON, Senior Judge [*], and RUBIN, Circuit Judge.

ALVIN B. RUBIN, Circuit Judge:

In the wake of a collision between admiralty and arrangement proceedings under Chapter XI of the Bankruptcy Act, appellant Good Hope Refineries challenges the decision of the district court to proceed with the merits of an in rem admiralty action to assert a lien against cargo for demurrage owed by Good Hope to the Atlantic Richfield Company despite an order issued by the United States District Court for the District of Massachusetts enjoining the prosecution of any actions against Good Hope. It also contends that the trial court erred in resolving the merits of the controversy by ruling that all cargoes transported by Good Hope aboard a vessel chartered from Atlantic Richfield for consecutive voyages over a one year period were impressed

---

[*] Senior Judge of the United States Court of Claims, sitting by designation.

with a lien in favor of the vessel owner for demurrage charges accruing on any voyage during the term of the charter. We conclude that the district court properly continued with the in rem action, but hold, on the merits, that the charter in question did not confer the broad lien sought by Atlantic Richfield.

Acting through a charter broker in New York, Good Hope chartered the vessel ATLANTIC COMMUNICATOR from Atlantic Richfield pursuant to a contract titled "Tanker Voyage Charter Party" on July 27, 1973. The vessel was to be used for the transportation of bulk petroleum products. The contract was on a printed form for a standard voyage charter—one designed for the charter of a vessel for a single trip—with certain minor modifications made by the parties, including a clause establishing the duration of the contract as twelve consecutive months with an option to renew for another year. The amount of free laytime—time spent in loading or discharging cargo—was dictated by the American Tanker Rate Schedule. Once Good Hope exceeded the 72 hours there allowed, it was charged a certain number of dollars per hour for demurrage. Demurrage charges ceased only when the cargo was completely discharged and the discharging hoses disconnected.

During the course of nineteen separate voyages from April 22, 1974 through May 31, 1975 Good Hope incurred $598,251.57 in demurrage charges. On July 11, 1975, Atlantic Richfield attached a cargo of 30,000 tons of oil in a United States district court in Florida, claiming a lien for the accumulated demurrage charges, none of which pertained to the voyage on which the 30,000 tons was carried. The cargo was released after Good Hope and its surety, Peerless Insurance Company, posted a security bond in the sum of $600,000.

On November 5, 1975, a federal district court in Massachusetts entered a general restraining order under Chapter XI of the Bankruptcy Act enjoining all persons from continuing to prosecute any actions against Good Hope. The Florida district court granted a motion to stay the in personam action against Good Hope, but permitted the in rem aspect to continue "to establish liability of the corporate surety on the bond of Peerless Insurance Company which has been substituted for the 30,000 tons of oil but any execution on that bond as against principal Good Hope Refineries, Inc. is restrained while the injunction described remains in effect."

After trial, the court concluded that Atlantic Richfield had, under the terms of the charter, a lien on all cargoes carried during the term of the charter for all demurrage charges incurred during the same period and entered judgment against Good Hope and Peerless Insurance for the amount of the bond, $600,000.[1] The practical effect of this interpretation was to impress a lien on the cargo carried during the most recent voyage for demurrage charges incurred during prior voyages.

## I. The Chapter XI Injunction

A bankruptcy court acting under Chapter XI may "enjoin or stay until final decree any act or the commencement or continuation of any proceeding to enforce any lien upon the property of a debtor." 11 U.S.C. § 714. The purpose of this stay is to prevent interference with, or diminution of, the assets of the debtor, see, e. g., *Teledyne Industries, Inc. v. Eon Corp.*, S.D.N.Y.1974, 373 F.Supp. 191, 203, and to protect the

---

1. The court initially entered judgment against Good Hope and Peerless in the amount of $639,078.61, representing the unpaid demurrage, attorneys' fees, and costs. The judgment was set aside and a final judgment entered for the amount of the bond after the court concluded that the amount of the lien against an in rem defendant could not exceed the bond.

   The court also refused to require Good Hope to post additional security to cover post-judgment interest on the ground that provision for such interest was not included in the terms of the bond. Atlantic Richfield appeals from this portion of the order to the extent that it might be construed to suggest that post-judgment interest could not be awarded on the judgment against Peerless as surety. In light of our disposition of the merits, it is unnecessary for us to reach this point.

bankruptcy court's exclusive jurisdiction over "the debtor and his property, wherever located." 11 U.S.C. § 711. These courts have similar power in Chapter X (reorganization) proceedings under 11 U.S.C. §§ 513, 516(4) and 548, and in bankruptcy under 11 U.S.C. § 11(a)(15). Thus, whether the petition is for bankruptcy, reorganization or an arrangement, the bankruptcy court has the power to enjoin admiralty proceedings in rem brought against a vessel or cargo that is the property of the debtor if the bankruptcy court has previously acquired jurisdiction over the property. *See, e. g., In re Meredosia Harbor & Fleeting Service, Inc.,* 7 Cir. 1976, 545 F.2d 583, 586–87, *cert. denied,* 1977, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359; *Texas Co. v. Hauptman,* 9 Cir. 1937, 91 F.2d 449, 451; *West Kentucky Coal Co. v. Dillman,* 8 Cir. 1926, 15 F.2d 25, 26; *Defense Plant Corp. v. United States Barge Lines, Inc.,* S.D.N.Y.1944, 57 F.Supp. 14, 15, *aff'd,* 2 Cir., 145 F.2d 766.

When the admiralty proceeding precedes the petition in bankruptcy court, the power of the bankruptcy court to enjoin further proceedings depends on the type of insolvency proceeding—that is, whether the action is in bankruptcy as distinguished from a reorganization (Chapter X) or an arrangement (Chapter XI)—and the nature of the property held by the admiralty court. Here, where the Massachusetts proceeding is pursuant to Chapter XI, and the res is a surety bond rather than property of the debtor, we conclude that the admiralty court properly proceeded with the in rem claim.

When an in rem action is instituted, the property comes into the jurisdiction of the admiralty court and neither the later filing of a bankruptcy proceeding nor the issuance of a stay by the bankruptcy court divests the maritime court of jurisdiction. *See, e. g., The Philomena,* D.Mass.1911, 200 F. 859.[2] This conclusion is a practical means of resolving the conflict between courts of concurrent jurisdiction by allowing the court that first secures custody of the property to proceed with the action without interference. *See Moran v. Sturges,* 1894, 154 U.S. 256, 284, 14 S.Ct. 1019, 1028, 38 L.Ed. 981, 990; *Bryan v. Speakman,* 5 Cir. 1931, 53 F.2d 463, 465, *cert. denied,* 1932, 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932; 1 Collier on Bankruptcy ¶ 2.10 at 180 (14th ed. 1974). *Cf. Parks v. B. F. Leaman and Sons, Inc.,* 5 Cir. 1960, 279 F.2d 529, 533 (appeal held moot). No competing need arises by virtue of the later insolvency proceeding, the purpose of which is solely to liquidate the debtor's estate and distribute its assets among creditors.

However, in reorganization and arrangement proceedings the court seeks to achieve the continuation of the debtor's enterprise, and it is essential to marshal all assets of that business necessary to its rehabilitation whether or not those assets are subject to liens. *See generally* G. Gilmore & C. Black, The Law of Admiralty 807–08 (2d ed. 1975); Landers, *The Shipowner Becomes a Bankrupt,* 39 U.Chi.L.Rev. 490, 509 (1972). Therefore, the powers of the court administering the debtor's estate are more extensive. Thus, in *In re J. S. Gissel & Co.,* S.D.Tex.1965, 238 F.Supp. 130, a stay issued in a Chapter X proceeding was held applicable to a suit in rem and in personam brought earlier to foreclose a preferred mortgage on a vessel.[3]

**2.** The same rule applies when a civil court has taken possession of property prior to bankruptcy, as in foreclosure of a mortgage. *See, e. g., Straton v. New,* 1931, 283 U.S. 318, 327, 51 S.Ct. 465, 469, 75 L.Ed. 1060, 1098; *In re Greenlie-Halliday Co.,* 2 Cir. 1932, 57 F.2d 173; *In re Smith,* S.D.Tex.1924, 3 F.2d 40, *aff'd sub nom. Paynter v. Slator,* 5 Cir. 1925, 8 F.2d 1021. See generally 1 Collier on Bankruptcy ¶ 2.63 (14th ed. 1974).

**3.** As Atlantic Richfield notes, an earlier decision, *In re Martin,* E.D.N.Y.1948, 78 F.Supp. 433, reaches a different conclusion than *Gissel* on similar facts; the New York court refused to allow a Chapter XI bankruptcy court to enjoin an in rem proceeding brought by a holder of a maritime lien prior to the institution of the arrangement proceeding. The distinctions sought to be made in *Gissel* are unconvincing. We conclude, however, that *Gissel* represents the better view and that a bankruptcy court hearing a Chapter X reorganization or Chapter XI arrangement proceeding may enjoin further action in a pending in rem admiralty suit

Were there property of the debtor involved, then, the stay would have been proper, and the Florida court's route would have been barred. Here, however, that court did not act with respect to "property of [the] debtor" or with respect to any asset needed for its rehabilitation. This action therefore neither falls within the literal language of the stay issued by the Massachusetts court, nor do the policies behind the broad injunctive powers of a Chapter XI bankruptcy court motivate us to extend that stay to embrace it.

■ The res at issue is the bond posted by the surety, Peerless; the cargo of oil is long gone and even its proceeds are presumably under reorganization administration. The admiralty court explicitly limited the action to one determining the liability of the surety on the bond. Under these circumstances, there is no need to preserve the property of the debtor for rehabilitative purposes and, therefore, no justification for a stay. *See, in accord, Kapczynski v. T. M. T. Trailer Ferry, Inc.,* E.D.Pa.1959, 176 F.Supp. 190, 192. *Cf. Peter Pan Seafoods, Inc. v. M/V Polar Viking,* W.D.Wash.1977, 446 F.Supp. 1283, 1285 (res was property of third party rather than of Chapter XI debtor).

Recent changes in the Bankruptcy Rules setting forth the proper procedure for challenging the operation of an ordered stay in a Chapter XI proceeding do not undermine this rationale: the res in question is not the property of the estate nor was it ever the property of the bankrupt. Whatever the procedure for challenging a stay, there was no property that the stay could operate to protect.[4]

Good Hope invites us to speculate that the arrangement between Good Hope and Peerless may have implicated other assets of the debtor in which the bankruptcy court might have an interest, and, therefore, that the outcome of the admiralty proceeding might have some potential impact on the Chapter XI proceeding. No evidence of such wave-wash has been presented. Moreover, should Peerless make a claim against assets now administered by the bankruptcy court, that court has the power adequately to safeguard the debtor's estate.

We therefore conclude that the district court properly proceeded with the in rem action against the bond posted by Good Hope and Peerless despite the pending Chapter XI proceeding and injunction issued by the district court in Massachusetts.

II. Interpretation of the Charter

■ The conclusion of the district court that the lien provision in the charter extended to all cargo carried during all voyages for demurrage charges owed on prior cargo was premised on its conclusion that the contractual provision was ambiguous as a matter of law. With this initial conclusion we must differ.

The contract signed by the parties was a voyage charter, modified to run for a particular time period. The court nevertheless concluded that they thereby created an ambiguity in the unaltered lien clause requiring it to be interpreted as if the contract were a standard time charter and thus divined, from the usages of the trade and the parties' practices after the contract was signed, their putative intent to embrace all cargo in the grasp of a lien. We do not perceive either patent or latent tenebrosity in the lien clause and we, therefore, conclude that the court erred in looking beyond the contract.

---

brought against a vessel or other property belonging to the debtor.

4. Rule 11–44, Rules of Bankruptcy Procedure, amended effective August 1, 1975, provides that a Chapter XI petition operates as an automatic stay of proceedings against the debtor or suits "to enforce any lien against his property," among others, and sets forth specific procedures creditors must undertake to secure relief from the stay. This rule supplements § 314 of

the Act, 11 U.S.C. § 714, which authorizes injunctive relief from *in personam* suits and suits with respect to property of the debtor. Under Rule 11–44, an action may be restrained when for policy reasons such an injunction is desirable. *See generally* 14 Collier on Bankruptcy ¶ 11–44.02 (14th ed. 1976). We have found no such policy reasons here. *Compare* 11 U.S.C. § 362, P.L. 95–598, 92 Stat. 2549 (1978), effective October 1, 1979.

Good Hope and Atlantic Richfield were not novices in the maritime shipping industry. They were aware that the vessel could be chartered pursuant to a standard time charter, but chose instead to execute the consecutive voyage charter before us. A typical voyage charter establishes rights and obligations on the part of owner and charterer quite different from those created by a time charter. *See,* for example, W. Poor, American Law of Charter Parties and Ocean Bills of Lading (5th ed. 1968); separate chapters are devoted to "Time Charters" and "Voyage Charters." *See also* the other authorities cited *infra.*

The voyage charter usually requires the shipowner to defray all operating expenses of the journey, including port charges, bunkers, loading and discharging, agency fees, commission, brokerage, fuel, ballast, dunnage, and claims. The charterer pays the owner freight dependent upon the cargo actually loaded, or upon the vessel's deadweight capacity. *See generally* J. Bes, Chartering and Shipping Terms 76–77 (10th ed. 1977); C. Cufley, Ocean Freights and Chartering 76–77 (1970); W. Poor, *supra,* §§ 21 *et seq.*

In a typical time charter, the vessel is hired for a stated period and the quantity of cargo carried by the charterer is usually irrelevant to the compensation (or hire) received by the owner. Hire is ordinarily payable in advance by the month or half-month, and may be a lump sum or a certain amount per ton capacity of the vessel. As in the voyage charter, the shipowner pays the wages of the officers and crew, insurance, general maintenance and upkeep of the vessel. The charterer generally assumes the burden of fuel costs, port charges, pilotage, ballast, dock dues, towage, bunkers, and cargo handling charges. *See generally* J. Bes, *supra,* at 69–70; C. Cufley, *supra,* at 77–78; A. Parks, Law of Tug, Tow and Pilotage 439, 569–77 (1971); W. Poor, *supra,* §§ 1 *et seq.*

A simple voyage charter can be extended to provide for a number of consecutive trips, and this is not uncommon in the transportation of liquid cargoes. *See* N.

Healy & D. Sharpe, Cases and Materials on Admiralty 406 (1974). It is no more inconsistent with the nature of such a charter to cause it to run until a termination date. This is evidently what the parties here deliberately sought. The terms of the charter they signed are, with only minor variations, those of a standard voyage charter.

The printed form, captioned "Tanker Voyage Charter Party," code word "Exxonvoy 1969," was found adequate but for the addition of 10 special provisions dealing with such subjects as loading and discharging ports, cargo, backhaul, ballast, war risk, certificate of financial responsibility, and, of course, duration of the contract. Apart from this last clause, none of the special provisions are different from those that might be included in a simple voyage charter.

Had the parties wished to alter the other printed clauses of the voyage charter, including the lien clause, they were evidently capable of doing so. We must therefore interpret the clause they accepted without modification, for application to consecutive voyages.

The lien clause in the charter reads as follows:

"The Owner shall have an absolute lien on the cargo for all . . . demurrage . . ., which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman."

On its face, the clause deals with a single cargo, presumably that on which demurrage charges were incurred. In contrast, the clause employed in the standard time charter grants the owner a lien "upon all cargoes, and all sub-freights for any amounts due under this Charter." W. Poor, *supra,* at 303.

If we look beyond the terms of the contract for latent ambiguities, we find none. The billing practices of the parties treated demurrage charges for each cargo discretely. Each statement sent Good Hope by Atlantic Richfield dealt with a separate

distinct voyage rather than a calendar period. There was never any attempt to assert a lien on subsequent cargoes for prior charges. The fact that demurrage was not computed until after the cargo was fully unloaded and the vessel had departed does not affirmatively demonstrate an intention to rely upon a lien on future cargoes; it is equally consistent with reliance on Good Hope's credit.[5]

■ Without doubt Atlantic Richfield had a lien on each cargo carried by Good Hope for all demurrage charges incurred during the course of its carriage. Such a lien arises by force of law and is present unless expressly waived in the charter. *See The Bird of Paradise*, 1867, 72 U.S. (5 Wall.) 545, 554, 18 L.Ed. 662, 664; *The Eddy*, 1867, 72 U.S. (5 Wall.) 481, 493, 18 L.Ed. 486, 488; *The Saturnus*, 2 Cir. 1918, 250 F. 407, 409, *cert. denied*, 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247. The first part of the lien clause merely preserved this implicit right.

■ The latter part of the lien provision purports to make the lien on cargo survive its delivery. The effect of this clause is not clear. The lien for freight and demurrage is possessory in nature, and, therefore, it is ordinarily lost by unconditional delivery of the cargo. *See, e. g., 4,885 Bags of Linseed*, 1861, 66 U.S. (1 Black) 108, 113, 17 L.Ed. 35, 38; *The Bird of Paradise, supra; In re 9,889 Bags of Malt*, 1 Cir. 1919, 262 F. 946, 948.

The Exxon charter form provides not only that the lien continues after delivery but also stipulates that the bill of lading will refer to and incorporate the charter. This, presumably, is an effort to give notice of the lien to third persons and to make the lien enforceable against them even if delivery was not expressly conditional. Assuming the bills of lading were issued in the form prescribed in the charter—incorporating the charter, including the lien clause, by reference—all who received cargoes carried by Good Hope aboard the ATLANTIC COMMUNICATOR would be on notice that Atlantic Richfield retained a lien for demurrage, and, if Atlantic Richfield were able to trace any of these cargoes, it could assert its lien for demurrage on the voyage during which the cargo was carried.

We need not, for purposes of this case, plumb the bottom to determine whether these provisions operating together have this effect. *See generally* G. Gilmore and C. Black, The Law of Admiralty 632 n.103 (2d ed. 1975); W. Poor, *supra*, §§ 25, 26 at 68 and 71. No attempt is made here to enforce the lien against delivered cargo. However, the very presence of these clauses indicates an intention to look to cargo to secure the lien for its carriage, not as security for debts of past voyages.

Atlantic Richfield argues that to impose upon it the obligation to assert a lien against each cargo for accrued demurrage on that voyage would work a commercial hardship upon both shipowner and charterer-shipper, and that the parties must therefore have intended that such charges be secured by a lien upon subsequent cargoes. Demurrage cannot be definitively quantified until the unloading process is complete; to assert a lien at this point would contribute to the laytime of the vessel and impair the parties' ability to utilize the vessel profitably. The existence of the problem is real, but its solution does not lie in judicial revision of the lien clause. The parties appear to have attempted its resolution in another fashion, by the lien continuation clause. If that clause did not, in combination with the bill of lading requirements, preserve the lien, conditional delivery was always an available remedy.

5. Atlantic Richfield argues that clause 6 of the charter special provisions, giving the company a right to compensation "at the demurrage rate" for the extent to which the time the ship sails in ballast exceeds the time it sails loaded with cargo over the life of the charter, shows that a lien on subsequent cargoes must have been intended to secure these prior "demurrage" charges. We are persuaded, however, that the choice of the demurrage rate for any charge imposed by the charter does not make that charge "demurrage" within the meaning of the lien clause. Excess ballast mileage compensation does not constitute demurrage as that term is conventionally defined. *See, e. g.,* G. Robinson, Handbook of Admiralty Law in the United States 644–45 (1939) and cases therein cited. The excess ballast clause, therefore, provides no insight into the parties' intention with respect to liens for demurrage.

In any event, the commercial inconvenience to which Atlantic Richfield adverts is no more acute in the consecutive voyage context than after a single voyage. When a cargo reaches its destination, the shipowner always has the choice of asserting rights against the cargo—by delivering it conditionally or attaching it—or permitting unconditional delivery and losing the lien. See W. Poor, supra, § 58. In the latter situation, the shipowner looks not to the cargo to secure demurrage costs, but to the personal credit of the charterer-shipper. Only because the personal credit of Good Hope has proved inadequate has Atlantic Richfield looked to more tangible sources of compensation.

The pressures of the enterprise put to Atlantic Richfield a difficult choice. Time has shown that the company made the wrong decision. We must, however, conclude that the parties never intended recourse against subsequent cargoes to be available. As the Supreme Court stated in *Osaka Shosen Kaisha v. Pacific Export Lumber Co.*, 1923, 260 U.S. 490, 499, 43 S.Ct. 172, 174, 67 L.Ed. 364, 367, "The maritime privilege or lien, though adhering to the vessel, is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore *stricti juris* and cannot be extended by construction, analogy or inference." The expansive interpretation of this maritime lien clause adopted below would have consequences far beyond the situation where the cargo belonged to the charterer and was seized before it left the vessel. The lien for the debts of past voyages would extend to cargo owned by others, and might, if all the other terms of the entire clause were literally enforced, follow that cargo after delivery, even if all freights due for its carriage were paid. We decline to sanction reinterpretation of words apparently clear to permit this result.

The judgment is therefore REVERSED.

GODBOLD, Circuit Judge, dissenting:

The decision to reverse rests on the conclusion of this court that the district court erred in finding the contract ambiguous. I think the district court was correct.

The parties used a printed form for a standard voyage charter and modified it to cover their agreement for a time charter for consecutive voyages for a twelve-month period with option in the charterer to renew for one additional year. Special Provision 4 was added:

This Charter Party shall remain in full force and effect for as many consecutive voyages as vessel can report for loading within twelve consecutive months from first tendering notice of readiness under this Charter Party. Charterers have the option for one additional year declarable by June 1st, 1974.

The lien clause in the printed form was not altered. It said:

21. LIEN. The owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorneys fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

With deference, the majority's reasoning appears to me defective. First, they examine the lien clause in stark isolation. "We must therefore interpret *the clause they accepted* without modification for application to successive voyages." (Mss. pp. 9–10, emphasis added.) The "interpretation" consists of simply stating that "on its face [the lien clause] deals with a single cargo." Mss. p. 10. This analysis, which treats the lien clause as though it had been clipped from the charter document and laid on the desk for scrutiny, is erroneous. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." Restatement of Contracts § 235(c). *See also* Comment thereto:

Where a writing contains a sentence or paragraph of doubtful meaning when taken by itself, it may be made clear by other parts of the writing, and even words which have in themselves a clear

meaning may be controlled and given a different meaning because of other parts of the writing.

*Id.* at 322. *See also* 3 Corbin on Contracts, § 536, p. 27:

[I]t can hardly be insisted on too often or too vigorously that language at its best is always a defective and uncertain instrument, that words do not define themselves, that terms and sentences in a contract, a deed, or a will do not apply themselves to external objects and performances. . . .

The reason for requiring consideration of the entire document is made clear by this case. The majority's initial inquiry was: "From reading only paragraph 21, what is 'the cargo' intended to mean?" Nothing in the lien clause, read in isolation, answers this inquiry. For example, goods carried by what means? So far as I know, railroad cars are leased rather than "chartered" but they incur demurrage and railroads issue bills of lading. If one concludes that the language is sufficient to establish unalterably that "the cargo" means goods carried by sea, does paragraph 21 cover goods carried by one vessel or several vessels? Dry cargo transported in the hold of a freighter, automobiles carried on the deck, or liquid in a tanker? Goods carried when? These and numerous questions are simply not answered on the face of paragraph 21. The words "the cargo" only take on flesh, substance and meaning when they are considered in the light of the contract as a whole.[1]

Examining the entire document, as we must, the essential inquiry is:

What is "the cargo" intended to mean where:

(a) the parties made a time charter for a single vessel for consecutive voyages, using the standard voyage charter form, with changes as described in the majority opinion.

(b) Paragraph 21 of the agreement reads as quoted above.

There is no truly unalterable answer but rather, at most, an unanswered tension between the consecutive voyage language of the agreement and such parts of the agreement, including paragraph 21, as tend to show intent to treat each consecutive voyage as a single voyage and the cargo as that carried on such single voyage. We must, then, look to the universe outside the document itself,[2] and examine the operative usages in the chartering of ships. Restatement of Contracts, § 230, p. 310. To aid in applying the standards for interpreting an agreement

(d) All circumstances accompanying the transaction may be taken into consideration [subject to exceptions not here applicable].[3]

*Id.* § 235(d), p. 319. All of this inquiry into the document and the usages of the trade is not for the purpose of modifying, curtailing or enlarging the meaning in paragraph 21 of "the cargo" but for the purpose of determining its meaning. Restatement of Contracts § 235, p. 324, Comment on Clause (d).

With the universe expanded beyond the instrument itself, the inquiry is broadened to add to factors (a) and (b), above, these factors:

The majority have expressly done what Professor Corbin points out that courts often do:

It seems highly probable that when a court says that it will enforce a contract in accordance with the "plain and clear" meaning of its words, the relevant surrounding circumstances have in fact been proved and have been carefully weighed. . . .

3 Corbin on Contracts, § 542, p. 105.

---

1. Even if examining the lien clause in splendid isolation were correct, the majority's conclusion drawn therefrom is not supportable. As already pointed out, no language in paragraph 21 tells us what "the cargo" means. The opinion does not state how the majority, by reading paragraph 21, came to the revealed truth that the correct and unalterable meaning of "the cargo" was cargo carried on a single voyage. The sole hint is the sentence following the revelation, quoting the standard time charter clause, which refers to "all cargoes." This is not information conveyed by paragraph 21, or even by the document as a whole, but is drawn from the universe extrinsic to the document.

2. If indeed we should not have done so earlier.

3. *See* Restatement of Contracts, §§ 228 and 230.

(c) In the usage of the trade, paragraph 21 is the usual provision for a voyage charter.

.(d) In the usage of the trade, the usual arrangement under a time charter is for a lien on "all cargoes".

What is the effect of the trade usages? Restatement of Contracts § 246:

Operative usages have the effect of (a) defining the meaning of the words of the agreement or the meaning of other manifestations of intention, and

(b) adding to the agreement or manifestations of intention provisions in accordance with the usage, and not inconsistent with the agreement or manifestations of intention.

*Id.*, Comment on Clause (a):

The rule stated in the Clause is not confined to unfamiliar words or to words often used ambiguously. Familiar words may have different meanings in different places. A usage may show that the meaning of a written contract is different from an apparently clear meaning which the writing would otherwise bear. . .

Clearly usages are operative here because of the occupations and experience of the parties, noted in the majority opinion. *See* Restatement of Contracts § 248.

Looking at factors (a), (b), (c) and (d), I would conclude, as the district court did, that "the cargo" included all cargoes, because this is the usual arrangement that parties make in time chartering for successive voyages and nothing here definitively tells us that they intended to depart from what is usual in the business. The illustration to Subsection 2 of Restatement, § 248, is instructive:

In an integrated contract, A promises to sell and B promises to buy a certain quantity of "white arsenic" for a stated price. In the trade in which A and B are both engaged, "white arsenic" means, among other things, arsenic colored with lamp black. This usage is operative, and (see § 246) defines the scope of the mean-ing of the words "white arsenic" in the agreement.

*Id.* at p. 355.

I would affirm the district court.