United States Court of Appeals,

Fifth Circuit.

No. 91–2827.

AROCHEM CORPORATION, Plaintiff–Appellant,

v.

WILOMI, INC., a/k/a WILLOMI, INC., Defendant–Appellee.

June 8, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before WILLIAMS and WIENER, Circuit Judges, and LITTLE,[*] District Judge.

JERRE S. WILLIAMS, Circuit Judge:

To insure payment for its carriage of crude oil from Scotland to Puerto Rico, Wilomi, Inc. arrested the oil subsequent to its delivery. Arochem Corp., appellant, which had purchased the oil, claimed the arrest was wrongful because Wilomi's lien was no longer valid. Arochem brought suit seeking damages for the allegedly wrongful arrest. Holding that the arrest was not wrongful because a valid lien existed, the district court granted summary judgment for Wilomi.

I. FACTS

On September 1, 1988, Marimpex Mineraloel–Handelsgesellschaft MBH & Co., KG ("Marimpex") entered into a charter agreement with the defendant Wilomi, Inc. ("Wilomi") for carriage of crude oil aboard Wilomi's tanker, the M/T CZANTORIA. Wilomi was to deliver the oil from Scotland to the U.S. Gulf. The charter agreement provides that English law governs the agreement's construction and performance. The CZANTORIA set sail on September 6, 1988.

On September 19, 1988, while the oil was enroute, Arochem purchased it from Marimpex. Marimpex then ordered the CZANTORIA to cancel its original destination and proceed instead to

[*]District Judge of the Western District of Louisiana, sitting by designation.

Guayanilla, Puerto Rico. Several days later, Marimpex sent Wilomi a letter of indemnity instructing the CZANTORIA to deliver the cargo to Arochem. Because Arochem would be unable to provide bills of lading upon the cargo's arrival at its destination, the letter of indemnity was required by Clause 50 of the charter agreement between Wilomi and Marimpex.

The CZANTORIA arrived and anchored eight nautical miles off Guayanilla, Puerto Rico[1] on September 24, 1988, and two days later it began delivering the oil into the M/T PHILLIPS VENEZUELA. The lightering operation involved three separate loadings over a nine-day period. At its conclusion, Marimpex became obligated to pay Wilomi $547,112.75 in total freight as well as $79,545.05 in demurrage for the extra port time used for loading and discharge. Wilomi sent a telex demanding payment, but the telex did not inquire as to Marimpex's interest in the cargo.

Marimpex informed Wilomi that, due to financial difficulties, Marimpex was unable to pay its obligation at that time. Clause 22 of the charter agreement grants Wilomi a maritime "lien upon the cargo for all freight ... [and] demurrage, and the cost of recovery of same." When Wilomi learned that Marimpex could not pay its $626,657.80 obligation, Wilomi immediately filed Lien Notices under 19 U.S.C. § 1564 with the United States Custom Service Puerto Rico office on October 6, 1988. In addition, Wilomi commenced an action the following day in the United States District Court for the Eastern District of Texas, asserting its maritime lien on the cargo aboard the PHILLIPS VENEZUELA. Wilomi gave no notice of either of these actions to Arochem.

On October 9, 1988, the United States Marshal arrested the cargo aboard the PHILLIPS VENEZUELA at the Sun Oil facility in Nederland, Texas, pursuant to a warrant issued under the provisions of Supplemental Admiralty Rule C(3) of the Federal Rules of Civil Procedure. In a

---

[1]Because it was anchored eight miles off the coast of Puerto Rico, the CZANTORIA was on the high seas, not in United States territory. At the time of this event, the United States recognized a territorial sea of three nautical miles. On December 27, 1988, the territorial sea was extended to twelve nautical miles. Presidential Proclamation No. 5928, 54 Fed.Reg. 777 (1989).

telephone hearing before the district court in Texas, Arochem explained to both District Judge Cobb and Wilomi's attorney that Arochem had purchased the cargo and had paid for the cargo under an irrevocable letter of credit.[2]  Arochem claimed it was not obligated to pay Wilomi to obtain the release of its cargo because it viewed the arrest as an unlawful taking.  Judge Cobb declined to make a ruling over the telephone.  Arochem advised the court that although it was capable of bonding the cargo, it refused to do so.

On October 12, 1988, Marimpex paid the amount owed for total freight and gave security for the demurrage.  The cargo was immediately released.  Consequently, Arochem brought this suit asking for damages in the approximate amount of $350,000 flowing from Wilomi's allegedly wrongful arrest.  After extensive discovery, Wilomi's motion for summary judgment was granted on April 30, 1991.  Arochem now appeals to this Court.

## II. CHOICE OF LAW

The primary issue is whether the district court applied the proper choice of law.  The district court applied American law to this case, but Arochem contends it should have applied English law.  We review the district court's choice-of-law determination *de novo.  Bailey v. Dolphin International, Inc.,* 697 F.2d 1268, 1274 (5th Cir.1983).  A dispute exists between the parties as to what process the district court used in determining which jurisdiction's law should apply.[3]  But, we are not concerned with what process the district court used.  We focus our attention on the validity of applying American law.

---

[2]Although Arochem had paid Marimpex with an irrevocable letter of credit, Arochem was still obligated under the sales contract to make an additional payment to Marimpex for demurrage. This additional payment could be used to satisfy a valid lien.

[3]Arochem, for example, asserts that the District Court applied the somewhat esoteric doctrine of *renvoi* in determining the choice of law.  Under the doctrine of *renvoi,* a court applying foreign law adopts the foreign jurisdiction's rules as to the conflict of laws.  The conflict rules may in turn refer the court back to the law of the forum.  This Court has expressed doubt as to the use of *renvoi.  Brandon v. Denton,* 302 F.2d 404, 409 n. 1 (5th Cir.1962); *Nailen v. Ford Motor Co.,* 873 F.2d 94, 96–97 (5th Cir.1989).

Arochem insists that the controlling case is *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). That case introduced the modern approach to choice-of-law issues in maritime cases. "Maritime law ... has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Id.* 345 U.S. at 582, 73 S.Ct. at 928. The Supreme Court enunciated the seven factors for a court to consider in a maritime tort case: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) inaccessibility of a foreign forum; and (7) the law of the forum.

Contrary to Arochem's assertions, these factors support the application of American substantive law. The wrongful act claimed in this lawsuit is the arrest of the cargo in Nederland, Texas, after its transshipment. The flag of the PHILLIPS VENEZUELA, the ship transporting the cargo at the time of arrest, is the American flag. The allegiance of the legal entity claiming injury further supports the use of American law because Arochem is a Delaware corporation with a principal place of business in Stamford, Connecticut.

Other factors cited in *Lauritzen* favor neither English nor American law. Although this court is unsure of the shipowner's allegiance, the CZANTORIA flew the Liberian flag. Also, both American and English courts are equally competent and accessible. We recognize, of course, that the charter agreement was negotiated, drafted, and executed in London and that the agreement itself provides in terms for English law to govern its construction and performance. This factor is rendered nugatory, however, because Arochem here claiming injury was not a party to the charter agreement.

Although we can distinguish the present case from *Lauritzen* because *Lauritzen* involved a torts claim under the Jones Act, the factors listed by the Supreme Court provide a useful outline from which to begin our analysis. The present case, however, more closely parallels *Gulf Trading &*

*Transp. Co. v. Vessel Hoegh Shield,* 658 F.2d 363 (5th Cir. Unit A 1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982). In *Gulf Trading,* we had to determine whether to apply English or American law in a maritime lien case in which one of the litigants was not a party to the contract. This Court favorably cited the factors in *Lauritzen* and then added:

> Leaving the contract, and entering the broader context of the maritime lien involving Gulf and the Vessel's owner, the *Restatement (Second) of Conflicts of Law § 6* sets forth principles to be applied in choice of law matters. In the absence of statutory directives and subject to constitutional restrictions, the relevant factors include (a) the needs of the international system, (b) relevant policies of the forum, (c) relevant policies of other interested states, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Gulf Trading,* 658 F.2d at 367; *see also, Cardinal Shipping Corp. v. M/S Seisho Maru,* 744 F.2d 461, 465 (5th Cir.1984).

The factors articulated in *Gulf Trading* favor applying American law. Arochem's claim is for wrongful arrest, and the arrest was administered by a United States Marshal in a United States port. Arochem is a United States company and Wilomi has a place of business and a general agent in the United States. With these contacts between the transaction and the United States, it is consistent and rational to apply American law.

Although the contract was formed in England, it is illogical to argue England has as great an interest as the United States in protecting an American purchaser from an unlawful arrest of cargo on an American vessel in an American port. *See, Gulf Trading,* 658 F.2d at 368. The district court, therefore, properly applied American law.

### III. WRONGFUL ARREST

Arochem claims on the merits that under United States law Wilomi wrongfully arrested the cargo. "The gravamen of the right to recover damages for wrongful seizure or detention of vessels is the bad faith, malice, or gross negligence of the offending party." *Frontera Fruit Co. v. Dowling,*

91 F.2d 293, 297 (5th Cir.1937). *See also, Marastro Compania Naviera v. Canadian Maritime Carriers Ltd.,* 959 F.2d 49, 53 (5th Cir.1992). The district court held that Wilomi carried its burden of showing that a lien existed on the cargo, and that Arochem failed to offer evidence to establish that the lien did not exist at the time of the arrest. We affirm the holding.

Under United States law, it has been settled for over a century that we presume a maritime lien exists in favor of a shipowner on cargo for charges incurred during the course of its carriage. *The Bird of Paradise,* 72 U.S. (5 Wall) 545, 554, 18 L.Ed. 662 (1866); *Atlantic Richfield Co. v. Good Hope Refineries, Inc.,* 604 F.2d 865, 872 (5th Cir.1979). "The lien for freight and demurrage is possessory in nature, and, therefore, it is ordinarily lost by *unconditional* delivery of the cargo." *Atlantic Richfield,* 604 F.2d at 872 (emphasis added). The parties to the transaction, however, may agree that the lien survives beyond discharge. *The Eddy,* 72 U.S. (5 Wall) 481, 495–96, 18 L.Ed. 486 (1866); *The Bird of Paradise,* 72 U.S. (5 Wall) at 555. In other words, the shipowner can make a conditional delivery of the cargo. *Atlantic Richfield,* 604 F.2d at 873 ("When a cargo reaches its destination, the shipowner always has the choice of asserting rights against the cargo—by delivering it conditionally or attaching it—or permitting unconditional delivery and losing the lien"). Practical considerations support the survival of a maritime lien beyond delivery:

> [I]t often happens that the necessities and usages of trade require that the cargo should pass into the hands of the consignee before he pays the freight. It is the interest of the ship-owner that his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery.... The consignee, too, in many instances, might desire to see the cargo unladen before he paid the freight, in order to ascertain whether all of the goods mentioned in the bill of lading were on board, and not damaged by the fault of the ship.... And if the cargo cannot be unladen and placed in the warehouse of the consignee without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the ship-owner and the merchant.... [I]t is frequently, perhaps more usually, understood between the parties, that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien, and the ship-owner reserves the right to proceed in rem to enforce it, if the freight is not paid.

*4,885 Bags of Linseed,* 66 U.S. (1 Black) 108, 114, 17 L.Ed. 35 (1861).

Accordingly, we must determine whether Wilomi conditionally or unconditionally delivered

the cargo. Analysis of the charter agreement between Wilomi and Marimpex resolves the issue. Clause 22 of the charter agreement explicitly grants Wilomi a lien against the cargo for "freight, deadfreight, demurrage and cost of recovery thereof." The charter agreement further provides, however, that payment for many of the costs is not due until after the cargo's delivery.[4] No rational person would establish a lien on cargo for certain costs that are due after delivery of the cargo but have delivery of the cargo extinguish the lien. If that were the case, the lien would be a futile mechanism for protection. Consequently, the parties must have intended the lien to survive delivery of the cargo.

The district court correctly granted Wilomi's motion for summary judgment against Arochem's wrongful arrest claim because Wilomi acted neither in bad faith, nor with malice or gross negligence. A company does not wrongfully arrest cargo by asserting a bona fide lien to protect its interest.

---

[4]Clause 7: "Freight shall be payable immediately after completion of discharge ..."

Clause 15: "The vessel shall discharge its cargo such that the period of time between the commencement of discharging and the completion thereof shall not, after the deduction of stoppages (if any), demanded solely by the shore terminal, exceed 24 hours. In the event that the time taken by the vessel for discharging exceeds 24 hours any demurrage claim submitted by Owners shall include the following information:

Vessel Facilities ...

Cargo ..."

Shore Facilities ...

Any demurrage claim submitted by Owners based, whether wholly or impartially, on excess discharge time as aforesaid shall not be deemed to have been correctly submitted until the aforementioned information has been provided in full and the liability of Charterers as to the payment of demurrage shall not arise until such a claim has been correctly submitted in accordance with the provisions of this Clause.

Clause 53: "Demurrage as well as other expenses for Charterer's account are payable after receipt of Owner's invoice supported by copy of Notice of Readiness, which Owners will endeavour to have duly signed, Statement of Facts and time sheets from load and discharge port(s) duly signed by shippers respectively receivers or agents and Master. Claims to be received by Charterers within 3 months from completion of discharge otherwise such claims are timebarred."

## IV. CONCLUSION

We find no error in the district court's treatment of this case. The district court properly applied American law because most of the parties and incidents were in the United States. Furthermore, the lien was still valid because Wilomi had not unconditionally delivered the cargo, and, therefore, the arrest was not wrongful.

AFFIRMED.