WESTERN BULK CARRIERS
(AUSTRALIA) PTY.,
LTD., Appellant,

v.

P.S. INTERNATIONAL, INC., Appellee.

No. IP 93–775 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 14, 1994.

 

Judy L. Woods, McTurnan & Turner, Indianapolis, IN, Charles L. Trowbridge, Treanor Harvey Sullivan Trowbridge & Mullen, New York City, for appellant.

Leonard Opperman, Thomas G. Burroughs, Bose McKinney & Evans, Indianapolis, IN, John P. Love, Proctor in Admiralty, New Canaan, CT, David Powlen, Diane Cruz–Burke, Barnes & Thornburg, Indianapolis, IN, for appellee.

## JUDGMENT

BARKER, Chief Judge.

In accord with the entry of this date, the court reverses the bankruptcy court's granting of BancOhio National Bank's summary judgment motion and denial of Western Bulk Carriers' cross-motion for the issuance of ancillary *in rem* process and remands the action for determination of whether demurrage is owed by PSI International, Inc. to Meridian Ship, Inc. Each side is to bear its respective costs.

## ENTRY

Western Bulk Carriers (Australia) Pty. Ltd. ("Western Bulk") appeals the bankruptcy court's granting of BancOhio National Bank's ("BancOhio") motion for summary judgment and the denial of Western Bulk's cross-motion for the issuance of ancillary *in rem* process. For the reasons stated below, we reverse the bankruptcy court's decision and find that material facts in controversy precluded its granting of summary judgment and denial of the cross-motion.

## I. BACKGROUND

Western Bulk, an Australian corporation, is engaged in the business of operating, chartering, subchartering, and trading with ocean going cargo vessels in international commerce. Western Bulk owns the ocean cargo vessel M/V Morland ("Morland"). P.S. International Limited, a/k/a P.S. International, Inc. ("PSI"), an Indiana corporation, buys, sells, trades, and exports agricultural products, including food grains. On January 22, 1990, PSI entered into a fully secured line of credit with BancOhio under which PSI's indebtedness was secured by an Agribusiness Security Agreement (the "Agreement"). Under the Agreement, BancOhio took a security interest [1] in virtually all of PSI's assets and was given the right to set off funds in PSI's

---

1. BancOhio's security interest in PSI's assets included:

 all goods, inventory and farm products ... which are for sale or lease ... work in process, finished goods ... and all other products and proceeds thereof, including ... inventories of ... agricultural commodities, supplies and packing materials [and]

 all of [PSI's] accounts, account receivables, contract receivables, grain receivable, notes, chattel paper, drafts, ... general intangibles ... rights to payment ... all deposits, money and all instruments of any kind reflecting grain owned by [PSI] [and]
 all assessions, substitutions, replacements, additions, proceeds and products of the foregoing. Security Agreement, at 1–2.

deposit account ("Account") with BancOhio. *See* Bankruptcy Court's Findings of Fact ("Findings"), at ¶ 5. BancOhio perfected its security interest on January 29, 1990. Findings, at ¶ 7. PSI regularly deposits into the Account all collections of accounts receivable and any sums generated by the sale of inventory. One of these deposits was a wire transfer in the amount of $209,459.00 from Dominica Export and Import Agency ("Dominica") on which BancOhio held a security interest. Findings, at ¶ 10.

Around May, 1990, Western Bulk time chartered[2] the Morland to Meridian Ship, Inc. ("Meridian") at a rate of $10,650.00 per day. The time charter gave Western Bulk a "lien upon all cargoes, and all sub-freights for any amounts due under this Charter." *See* Time Charter, ¶ 18. Around May 10, 1990, Meridian subchartered space to PSI for a fixed rate of $43.00 per metric ton. Under the terms of the subcharter, Meridian agreed to transport for PSI 15,000 metric tons of soybean meal from a port in Louisiana to a port in Manila, Philippines and PSI paid "freight"[3] to Meridian.

In August, 1990, Meridian filed for bankruptcy and failed to pay $1,304,029.21, the amount Western Bulk claims Meridian owed for unpaid time charter hire, fuel, and other charges. On July 20, 1990, Western Bulk gave formal notice to PSI that it intended to exercise its maritime lien on the subfreights due from PSI to Meridian, including demurrage[4] in the amount of $610,672.57 earned in the course of discharging the cargo of soybean meal at Manila. PSI denied that it owed any demurrage to Meridian.

On April 2, 1991, Western Bulk activated its lien by requesting a writ of attachment pursuant to Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims ("Supplemental Rules") of the Federal Rules of Civil Procedure.[5] The U.S. District Court for the Southern District of Ohio issued the attachment order, permitting Western Bulk to attach PSI's Account with BancOhio. The order served on BancOhio on April 3, 1991, froze $210,509.49 in the Account of which $209,459.00 constituted the wire transfer from Dominica.

**2.** A charter party or charter is an agreement between shipowner and charterer pursuant to which the charterer leases or rents all or part of the vessel. *See generally*, Gilmore and Black, The Law of Admiralty § 4–1, 193 (2d Ed.1975).

In a "time charter," the vessel is hired for a given period. The hire is usually payable in advance by the month or half-month. The shipowner pays the wages of the officers and crew, insurance, general maintenance and upkeep of the vessel. The charterer pays the fuel costs, port charges, pilotage, ballast, dock dues, towage, bunkers, and cargo handling charges. *See Atlantic Richfield Co. v. Good Hope Refineries Inc.*, 604 F.2d 865, 871 (5th Cir.1979) (citing J. Bes, Chartering and Shipping Terms 76–77 (10th ed. 1977)).

**3.** "Freight" is the compensation owed a shipowner for the carriage of goods and includes the amount due to a shipowner under a charter party. *See U.S. v. Robins Dry Dock & Repair Co.*, 13 F.2d 808, 813 (1st Cir.1926). "Subfreights" are the freights Meridian earned for the carriage of cargo while Meridian operated the Morland.

**4.** "Demurrage" is "compensation of the shipowner for days that the ship lies useless at port because loading or unloading of cargo has proceeded more slowly than expected" or because loading or unloading has exceeded the free time

(laytime) permitted in the charterparty. *See Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 472 n. 16 (5th Cir.1984). It is frequently termed "extended freight."

**5.** Rule B provides as follows:

With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or the plaintiff's attorney that, to the affiant's knowledge, or to the best of the affiant's information and belief, the defendant cannot be found within the district. The verified complaint and affidavit shall be reviewed by the court and, if the conditions set forth in this rule appear to exist, an order so stating and authorizing process of attachment and garnishment shall issue.

Rule B attachments on subfreights not appurtenant to the arrested vessel can be avoided by the bankruptcy trustee. *See In re North Atlantic & Gulf S.S. Co.*, 204 F.Supp. 899, 912 (S.D.N.Y.1962), *aff'd*, *Schilling v. A/S D/S Dannebrog*, 320 F.2d 628 (2d Cir.1963).

On April 3, 1991, Western Bulk filed a verified *in rem*[6] complaint in admiralty against the freights, including demurrage, of the Morland in the U.S. District Court for the Southern District of Indiana. Findings, at ¶ 16. Western Bulk instituted other attachment and *quasi in rem* suits in Ohio and Illinois, all of which were subsequently transferred to the Southern District of Indiana. After bankruptcy proceedings commenced on October 2, 1991, all suits were automatically stayed. By consent of the parties, all three admiralty suits, the *in rem* suit, and the Ohio and Illinois attachment suits were consolidated in the bankruptcy proceeding.

BancOhio moved for summary judgment on October 29, 1992, claiming that its security interest in the PSI funds in the Account was superior to any interest Western Bulk possessed. Western Bulk brought a cross-motion for the issuance of ancillary *in rem* process against the funds. On May 19, 1993, the bankruptcy court granted BancOhio's motion for summary judgment and denied Western Bulk's cross-motion for the issuance of ancillary *in rem* process against the funds. The bankruptcy court found that because none of the funds attached by Western Bulk were freights, subfreights or in any manner related to the Morland, Western Bulk did not possess a maritime lien superior to Banc-Ohio's perfected security interest. Western Bulk now appeals the bankruptcy court's decision to this court.

## II. DISCUSSION

### A. STANDARD OF REVIEW

 The district judge is required to accept the bankruptcy judge's findings on questions of fact as long as they are not clearly erroneous. *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993). "The clearly erroneous standard requires this court to give great deference to the bankruptcy court, the trier of fact. Under this standard, if the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced that it would have weighed the evidence differently as tri-

er of fact." *Matter of Love*, 957 F.2d 1350, 1354 (7th Cir.1992). Indeed, the reversal under the clearly erroneous standard is only warranted if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (citing *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir.1988)). We note, however, that the bankruptcy court's conclusions of law are subject to de novo review on appeal. *Matter of Wiredyne, Inc.*, 3 F.3d 1125, 1126 (7th Cir.1993); *Matter of Newman*, 903 F.2d 1150, 1152 (7th Cir.1990).

### B. WESTERN BULK'S DISPUTED MARITIME LIEN

 The core question on appeal is whether Western Bulk has a maritime lien in PSI's funds on deposit in its Account with Banc-Ohio or only an attachment interest as a lien creditor under Ohio Revised Statutes § 1309.20(C). If Western Bulk possesses a maritime lien on the deposited funds, its lien would have priority over all non-maritime claims, including BancOhio's perfected Uniform Commercial Code (UCC) security interest. *See Matter of Topgallant Lines, Inc.*, 154 B.R. 368, 376, 1993 A.M.C. 2775 (S.D.Ga. 1993). If, however, Western Bulk does not have a maritime lien but only holds an attachment interest, BancOhio's perfected security interest would have priority.

The bankruptcy court held that Western Bulk's "claim is not a maritime lien because the property attached is not the freights or subfreights or in any way connected with the M/V Morland." Conclusions of Law ("Conclusions"), at ¶ 15. The court reasoned that because the Account consisted of funds almost exclusively derived from the wire transfer from Dominica Export and Import Agency, they were not freights or subfreights of the Morland and were not related to any subfreights. Conclusions, at ¶ 16. Moreover, the court noted that because only a U.S. District Court "setting (sic) in Admiralty with the custody of the *res* can execute a maritime lien, the attachment in Ohio is not an action to execute a maritime lien." Conclusions, at ¶ 18.

---

**6.** In an *in rem* action, the vessel itself can be held liable for a debt that creates a maritime lien. *See*

*Perez & Compania (Cataluna), S.A. v. M/V MEXICO I*, 826 F.2d 1449 (5th Cir.1987).

### 1. General Principles Regarding Maritime Liens

The leading treatise on admiralty law—Gilmore & Black, The Law of Admiralty (2d Ed.1975) ("Gilmore & Black")—has noted that a "maritime lien" has few, if any similarities to land liens in the common-law sense of the term. *See* Gilmore & Black, § 9–1, at 586. The authors give the following guidance regarding the scope of maritime liens:

> [t]he maritime lien attaches to the ship and her appurtenances, cargo, the wreck of these, the proceeds of sale and the freight. It may exist on the cargo for freight and salvage, and on the freight for seamen's wages and perhaps master's disbursements. Gilmore & Black, § 9–19, n. 80, at 622....

> There can be no maritime lien which does not involve a vessel, its cargo or freight and arise out of a maritime contract or a maritime tort or some peculiarly maritime operation such as salvage. *Id.,* § 9–20, at 624....

Cases commenting on the nature of maritime liens give similar descriptions. For example, in *Cardinal Shipping Corp. v. M/S Seisho Maru,* 744 F.2d 461, 466 (5th Cir. 1984), the court found that a maritime lien "arises by operation of law to provide security to the victims of certain maritime torts and contract breaches. Plaintiffs bring an action directly against the vessel *in rem.* If they are victorious on the merits, they may enforce the judgment by condemnation and sale of the ship."

Similarly, in *Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd.,* 982 F.2d 765, 766, 1993 A.M.C. 609 (2d Cir.1992), the court stated that a maritime lien is:

> a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds. (citation omitted).

From these authorities, we conclude that Western Bulk has a maritime lien on the debt generated by Meridian's breach of its charter party and that this lien extends to freights and subfreights that are owed. The general definitions do not answer whether Western Bulk's maritime lien extends to separate funds held by a subcharterer.

### 2. Western Bulk's Lien on Alleged Demurrage

The debt Western Bulk is seeking to recover is the amount PSI allegedly owed to Meridian, which in turn, owed money to Western Bulk. The courts have adopted several principles regarding a shipowner's assertion of maritime liens. First, a shipowner must include a specific provision in the charter party giving it a lien on subfreights earned by his vessel. *See Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co.,* 227 F.Supp. 872, 880 (S.D.N.Y.1964); *Marine Traders, Inc. v. Seasons Nav. Corp.,* 422 F.2d 804, 806 (2d Cir.1970). Second, a maritime lien can arise from the breach of the charter party. *See Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1027 (2d Cir. 1973). Third, a shipowner may assert his maritime lien by giving notice to the shipper of its existence any time prior to the payment of the subfreights by the shipper. *See In re North Atlantic & Gulf S.S. Co.,* 204 F.Supp. 899, 904 (S.D.N.Y.1962).

Here, Western Bulk had an express provision in its charter party with Meridian giving it a lien on the subfreights owed by PSI to Meridian. Meridian breached its charter party with Western Bulk by failing to pay the charges owed and filing for bankruptcy. Western Bulk asserted its lien against any subfreights owed by PSI to Meridian by giving notice to PSI before it paid its subfreights to Meridian.

Moreover, the shipowner's lien also extends to demurrage. In *Atlantic Richfield Co. v. Good Hope Refineries,* 604 F.2d 865, 872 (5th Cir.1979), the Fifth Circuit found that a shipowner had a lien on each cargo carried by the charterer for all demurrage charges incurred during the course of its carriage. The court noted that "[s]uch a lien arises by force of law and is present unless expressly waived in the charter." *Id.* (citing *The Bird of Paradise,* 72 U.S. (5 Wall.) 545, 554, 18 L.Ed. 662, 664 (1866)). While a lien on demurrage is ordinarily lost

by unconditional delivery of the cargo, *see* 604 F.2d at 872, when one has notice of adverse rights before the cargo has been discharged, he must "retain the cargo or condition the cargo's release on the substitution of freight." *See Taiwan Int'l Line Limited v. Matthew Ship Chartering Ltd., Montreal,* 546 F.Supp. 826, 830 (S.D.N.Y.1982).[7] The shipowner may be permitted to enforce the lien beyond discharge, until the freight and demurrage are paid. *See Raymond v. Tyson,* 58 U.S. (17 How.) 53, 63, 15 L.Ed. 47 (1854).

Based on the above authorities, the court finds that the bankruptcy court erred in granting BancOhio's summary judgment motion because there is a genuine issue of material fact regarding whether PSI owed demurrage to Meridian. If such demurrage is owed, then Western Bulk's maritime lien would extend to the funds in PSI's possession, including the amounts deposited in the Account with BancOhio. If, on the other hand, no such demurrage is owed, no debt or obligation giving rise to a maritime lien would exist.[8]

We reject the proposition that Western Bulk possesses no maritime lien on the funds deposited in the Account because the funds were not earned by the vessel, but rather from a wire transfer from a third source. We have found no authority suggesting that the source of a debtor's funds determines whether the funds are subject to maritime liens. We hold that the existence of Western Bulk's maritime lien does not depend on the source of the money satisfying the debt but rather on whether the debt being satisfied is one commonly recognized as subject to maritime liens. In this case, demurrage allegedly owed by PSI to Meridian is subject to Western Bulk's maritime lien which arose when Meridian breached its charter party with Western Bulk.[9]

Our conclusion is consistent with the Supreme Court's holding in *United States v. Freights, etc. of S.S. Mount Shasta,* 274 U.S. 466, 47 S.Ct. 666, 71 L.Ed. 1156 (1927), where the Supreme Court held that subfreights could constitute a res sufficient to give a court jurisdiction *in rem.* In *Mount Shasta,* a shipowner, whose charter contained the customary lien provision, was allowed to maintain a libel *in rem* against subfreights alleged to be due from a subcharterer even though the amount due was unliquidated and in dispute. *See* Gilmore & Black, at 632 n. 103. Reasoning that "a debt may be treated as a res as easily as a ship," the Court further observed:

It is true that [the debt] is not tangible, but it is a right of the creditor's, capable of being attached and appropriated by the law to the creditor's duties. The ship is a res not because it is tangible but because it is a focus of rights that in like manner may be dealt with by the law....

But if it be conceived that the Admiralty Court has jurisdiction to enforce a lien on sub-freights by a proceeding in rem, ... we do not perceive how the Court can be

7. Gilmore & Black note:

[w]here freight is unpaid (or where cargo has damaged the ship), there is a lien—i.e. the cargo can be libeled *in rem* and sold. *The lien against cargo also includes demurrage*—sometime said to be 'an extended freight'—at both the loading and the discharging port. The peculiarity of the lien against cargo is that, unlike liens against the vessel or her freight, the cargo lien is possessory, and is lost by unconditional delivery to the consignee. Gilmore & Black, at 631. (emphasis added).

8. It is important to note that because maritime liens are secret ones "which may operate to the prejudice of general creditors and purchasers without notice," courts generally will not extend them by "construction, analogy or inference." *See Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 499, 43 S.Ct. 172, 174, 67 L.Ed. 364 (1923); *Atlantic & Gulf Stevedores v. M/V Grand Loyalty,* 608 F.2d 197 (5th Cir.1979); *Vandewater v. Mills, Claimant Steamship Yankee Blade,* 60 U.S. (How.) 82, 15 L.Ed. 554 (1856); *In re Admiralty Lines, Ltd.,* 280 F.Supp. 601, 604–605 (E.D.La.1968), *aff'd, Admiralty Lines, Ltd. v. Cooper Stevedoring of Louisiana, Inc.,* 410 F.2d 398 (5th Cir.1969). By holding that Western Bulk has a maritime lien on separate funds if and only if the funds satisfy demurrage owed, this court is not extending the scope of maritime liens, which has traditionally included demurrage.

9. *See* Gilmore & Black, at 632 n. 103 ("If the owner of the cargo (PSI) has notice of the lien provision [in the charter], the shipowner may enforce his lien against the cargo and, after delivery, against any freight remaining unpaid.")

deprived of jurisdiction merely by answer denying that such freights are due. The jurisdiction is determined by the allegations of the libel. It may be defeated upon the trial by proof that the res does not exist. But the allegation of facts that if true make out a case entitles the party making them to have the acts tried.... Here the debtor is within the power of the Court and *therefore the debt, if there is one, is also within it.* (emphasis added).

274 U.S., at 470–471, 47 S.Ct., at 666–667.

Applying the principles of *Mount Shasta* to this case, we find that if demurrage is in fact owed by PSI to Meridian, the fact that PSI denies that such demurrage is owed does not deprive Western Bulk of its maritime lien. *Mount Shasta* does not suggest that the debt can only be collected from funds generated by the shipping transaction that produced the debt. If indeed PSI owed demurrage to Meridian, then PSI's funds, which could be applied to satisfy such demurrage, would be subject to Western Bulk's maritime lien and therefore higher in priority than BancOhio's security interest. If PSI owes no demurrage to Meridian, Western Bulk would possess no maritime lien over PSI's funds; and any interest it did possess would be subsidiary to BancOhio's prior perfected security interest in the funds in the Account. The bankruptcy court erred in holding that even if PSI owed demurrage to Meridian, Western Bulk's maritime lien on subfreights did not reach the general funds of PSI's Account.

Finally, BancOhio contends that because Western Bulk failed to bring suit via a Rule C [10] proceeding *in rem* in its Ohio action, it necessarily could not have obtained a maritime lien. This argument ignores the fact that Western Bulk's maritime lien arose from Meridian's breach of its charter party with Western Bulk. Although a proceeding *in rem* under Rule C requires plaintiff to hold a maritime lien, *see `Sembawang Shipyard, Ltd. v. Charger, Inc.,`* 955 F.2d 983, 987 (5th Cir.1992), it does not follow that Western Bulk did not possess a maritime lien because it chose to proceed via Rule B attachment in Ohio. In fact, the consolidation of all suits in the bankruptcy proceeding in Indiana means that this court is an admiralty court acting *in rem* with full powers to execute a maritime lien. We thus reverse the bankruptcy court's denial of Western Bulk's cross motion for the issuance of ancillary *in rem* process subject to the determination of whether demurrage is owed by PSI to Meridian.

### CONCLUSION

Finding a genuine issue of material fact regarding whether demurrage is owed by PSI to Meridian, we reverse the bankruptcy court's granting of BancOhio's summary judgment motion and its denial of Western Bulk's cross motion and remand the case for further proceedings in accord with this entry.

It is so ORDERED.

**10.** Rule C(3) of the Supplemental Rules provides:
JUDICIAL AUTHORIZATION AND PROCESS ... the verified complaint and any supporting papers shall be reviewed by the court and, if the conditions for an action *in rem* appear to exist, an order so stating and authorizing a warrant for the arrest of the vessel or other property that is the subject of the action shall issue and be delivered to the clerk who shall prepare the warrant and deliver it to the marshal for service. If the property that is the subject of the action consists in whole or in part of freight, or the proceeds of property sold, or other intangible property, the clerk shall issue a summons directing any person having control of the funds to show cause why they should not be paid into court to abide the judgment....

Rule C(5) of the Supplemental Rules provides:
In any action *in rem* in which process has been served as provided by this rule, if any part of the property that is the subject of the action has not been brought within the control of the court because it has been removed or sold, or because it is intangible property in the hands of a person who has not been served with process, the court may, on motion, order any person having possession or control of such property or its proceeds to show cause why it should not be delivered into the custody of the marshal or paid into court to abide the judgment; and, after hearing, the court may enter such judgment as law and justice may require.