United States Court of Appeals,

Fifth Circuit.

No. 93-1258.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity,
Plaintiff-Appellee,

v.

Billy D. MASSINGILL, Defendant-Appellant.

July 6, 1994.

Appeal from the United States District Court for the Northern
District of Texas.

Before HIGGINBOTHAM and WIENER, Circuit Judges, and KAUFMAN,[*]
District Judge.

FRANK A. KAUFMAN, District Judge:

This case arises from an action brought by the Federal Deposit

Insurance Corporation ("FDIC") against Billy D. Massingill for the

amounts owed upon two promissory notes ("Notes") issued by

Massingill and another individual to a now-defunct New Mexico bank.

United States District Judge Sam R. Cummings, in a partial summary

judgment order issued pursuant to Fed.R.Civ.P. 56(d) and upon the

conclusion of a bench trial, entered judgment for the FDIC in the

full amounts requested by that agency in connection with both

Notes. For the reasons set forth *infra,* we affirm the judgment of

the district court.

I.

Billy D. Massingill and Charles S. Christopher, both residents

of Texas, executed two promissory notes in favor of Moncor Bank,

---

[*]District Judge of the District of Maryland, sitting by
designation.

N.A., ("Moncor" or "Bank"), located in Hobbs, New Mexico. Note 1, in the amount of $360,000, was secured by 20,000 shares of stock in Fiberflex Products, Inc. ("Fiberflex"), a Texas corporation.[1] Massingill and Christopher signed that Note as co-makers on March 22, 1984, in order to acquire those shares of Fiberflex. Massingill was a founding shareholder and director of Fiberflex, but he sold his shares to Christopher later in 1984. Note 1 was payable in four semi-annual installments of $40,000, plus interest, on September 25, 1984; March 25, 1985; September 25, 1985; and March 26, 1986; with the balance, along with remaining interest, due on September 25, 1986. According to the face of Note 1, the interest rate was to be "[a] variable rate equal to 1/27 per year above Bank's Base Lending Rate. Base Lending Rate is the rate set from time to time by Bank, below which loans will not usually be made."

Christopher and Massingill, again as co-makers, executed another promissory note, referred to herein as Note 2, in favor of Moncor, in the amount of $125,500, in December 1984. The first installment on Note 2 apparently was due in late March 1985. The payment was not made, and Massingill seemingly refused either to renew or repay the Note in default. As a result, pursuant to insecurity clauses[2] in the defaulted Note 2 and in Note 1, the

---

[1]Note 1 actually was executed in favor of "First City National Bank." First City changed its name to Moncor before the second note was executed.

[2]The insecurity clauses in each Note provide as follows:

DEFAULT: BORROWER SHALL BE IN DEFAULT under this Note

2

executive vice president of Moncor sent Christopher a letter dated May 23, 1985, with a copy to Massingill, which stated in pertinent part:

> Since [the defaulted] note is now 66 days past due and it does not appear that Billy Massingill is willing to sign a renewal note, we are hereby placing you both on notice that both notes [the defaulted note and Note 1] are immediately due and payable.
>
> If the entire balance plus accrued interest is not paid within 10 days from the date of this letter, we will proceed with legal action to collect our interest in the Fiberflex, Inc., stock which was assigned to MONCOR Bank, and we will pursue collection of any deficiency from both makers of said notes.

In that letter, Moncor also delineated the precise amounts due and the daily sums by which the outstanding balance would accrue. Although Note 1, in and of itself, technically was not in default, Moncor demanded payment upon that Note as well, in accordance with the insecurity provision in that Note.

The defaulted Note 2 eventually was renewed. That renewed note will be referred to as Renewed Note 2. Renewed Note 2, payable to Moncor Bank, was a promissory note in the amount of $125,150, and was secured in part by 21,500 shares of Fiberflex stock and in part by the assignment to Moncor of a life insurance

---

if any of the following events occur:

....

> 5. Bank reasonably and in good faith believes it is insecure or believes that the prospect of receiving payment on this Note or any other indebtedness is in any way impaired, even though the Borrower is not otherwise in default.
>
> Upon default and at any time after default, Bank may declare this Note and all other indebtedness immediately due and payable without notice or demand.

3

policy belonging to Christopher. Renewed Note 2 provided for payment in two installments. The first installment, of $60,000 plus interest, was due on September 25, 1985, with the balance, including interest, payable on March 25, 1986. Renewed Note 2 carried an interest rate of 27 above Moncor's Base Lending Rate. It was dated March 18, 1985, although Massingill maintains that it was executed on June 11, 1985. Massingill also contends that he signed Renewed Note 2 only as a surety to accommodate Christopher, despite the fact that the Note itself indicates that both he and Christopher signed the Note as "Borrowers."

Note 1 itself was never in default because of failure to make installment payments, or for any reason; however, it was subject to acceleration under the terms of the insecurity clause in Note 1 and Note 2. On August 30, 1985, the Comptroller of the Currency declared Moncor Bank to be insolvent, and the appellee Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver. United Bank of Lea County, New Mexico, acquired both Note 1 and Renewed Note 2, along with other loans which had been made by Moncor and which were considered non-delinquent or non-classified,[3] with the understanding that, within 90 days of acquisition, United Bank could return to the FDIC those loans which United Bank did not wish to retain. Both Note 1 and Renewed Note 2 apparently were listed in Moncor's records as current. On October 9, 1985, during the time that those Notes were held by United Bank, that bank

---

[3]According to the testimony of the FDIC account officer at trial, a "classified" loan is a loan deemed by a bank examiner, for whatever reason, to be not collectible.

4

received and accepted the September 25, 1985, installment payments with respect to both Notes.  In determining the amounts of the installment payments owed with regard to those two Notes, United Bank substituted its prime rate of interest for Moncor's Base Lending Rate, which was the rate designated in those Notes as the benchmark from which interest due would be calculated.  Shortly thereafter, in December 1985, FDIC re-purchased those Notes and their attendant files from United Bank.  At that time, the outstanding amount owed upon Note 1 was $240,000 principal, plus interest, and, upon Renewed Note 2, $65,000 plus interest.  The FDIC, upon reacquiring the Notes, continued to rely upon the prime rate of United Bank in order to compute the accruing interest.

No payments were made upon either Note at the time in which the March 25, 1986, installments became due.[4]  Those were the first payments missed in connection with either Note since the execution of Renewed Note 2.  Upon that default in connection with Note 1 and Renewed Note 2, the FDIC demanded payment and filed suit on March 23, 1992, against Massingill for the outstanding balances due upon both Notes.  The FDIC brought its action in federal district court pursuant to 12 U.S.C.A. § 1819(b)(2) (West 1989).[5]

---

[4]Appellant Massingill maintains that at no time did he personally make or participate in payments on any of the Notes relevant to this case.  According to Massingill, after he sold his shares in Fiberflex to Christopher, the latter apparently assumed responsibility for submitting payments with regard to the Notes.

[5]§ 1818(b)(2)(A) provides:

>     Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which

The FDIC filed a motion for summary judgment, seeking to recover upon both Notes by arguing that 12 U.S.C.A. § 1823(e) (West 1989)[6] and the federal common-law doctrines enunciated in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny, barred Massingill's claims and defenses. The district court denied the FDIC's motion for summary judgment and, pursuant to Fed.R.Civ.P. 56(d), issued an order stating that the applicable limitations period with regard to Note 1 prescribed by the applicable statute had expired before the FDIC brought suit, thereby barring the agency's claim in connection with that Note.[7]

---

the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States.

[6]§ 1823(e) states:

No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

[7]The statute of limitations applicable in this case, according to both parties and the district court, is 12 U.S.C. §

6

The court also precluded Massingill from asserting an affirmative defense that the FDIC unjustifiably had impaired the collateral securing Renewed Note 2 by ruling that Massingill signed that Note as a co-maker. Under Texas law, which the district court applied, a maker of a note may not assert that defense. The court determined that the only issues remaining for trial concerned whether the FDIC was owner and holder of Renewed Note 2, the amount of accrued interest owed upon the remaining balance of Renewed Note 2, and the amount of attorney fees, if any, to which the FDIC was entitled.

On February 18, 1993, upon the parties' waiver of jury trial,[8] a bench trial before Judge Cummings commenced. During the course of the trial, the FDIC demonstrated that it was the owner and holder of both Note 1 and Renewal Note 2.[9] Upon the conclusion of the presentation of evidence, Judge Cummings indicated that he would reconsider his Rule 56(d) order in connection with the limitations bar as to Note 1 and requested that the parties submit memoranda and authorities with regard to Note 1, along with proposed findings of fact and conclusions of law dealing with all

1821(d)(14). That statute, at § 1821(d)(14)(A), provides for a limitations period of six years, "beginning on the date the claim accrues."

[8]The only evidence in the record before this Court concerning that waiver appears in a "Minute Order" in the district court file, which merely notes that the parties waived any right to a jury determination and that the jury subsequently was excused.

[9]Appellant in this appeal does not contest that the FDIC is the owner and holder of both Notes and that appellant executed the Notes at issue in this case, along with Christopher.

7

of the issues in the case. The court also asked the parties further to brief the question of the applicable rate of interest in connection with the Note 1 and Renewal Note 2. At no time after learning of the district court's decision to reconsider its earlier order did Massingill request a jury trial or seek to introduce any further evidence with regard to any reopened issue. After reviewing the memoranda supplied by the parties, on March 2, 1993, the district court reversed its earlier determination and entered judgment in favor of the FDIC with regard to both Note 1 and Renewal Note 2. It awarded the FDIC the outstanding principal remaining upon those Notes; interest calculated in accordance with the prime rate of United Bank, as the assuming bank which briefly possessed the Notes upon Moncor's closure; and attorney fees. The district court applied Texas law in the course of concluding that the May 23, 1985, letter from Moncor to Christopher and Massingill was not an effective acceleration, thereby leaving both Notes current until their default on March 25, 1986. Consequently, the district court decided that the FDIC had timely filed its action with regard to both Notes and was entitled to recovery.

In the within appeal, Massingill contends that the district court wrongly reversed its earlier order with regard to the expiration of the limitations period as to Note 1, incorrectly prevented Massingill from asserting his defense of impairment of collateral in connection with Renewal Note 2, and improperly adopted United Bank's prime rate as the benchmark for its determination of the interest due upon both Notes. For the reasons

8

set forth *infra,* we affirm the judgment of the district court with regard to each of those issues.[10]

## II.

In this appeal, Massingill first contends that it was improper for the district court to revisit its Rule 56(d) order. That contention is without merit. We review the district court's revision of the order for abuse of discretion. *Harrell v. DCS Equip. Leasing Corp.,* 951 F.2d 1453, 1460 (5th Cir.1992). A partial summary judgment order in accordance with Rule 56(d) is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case. Such an order is interlocutory in nature, is subject to revision by the district court, and has no *res judicata* effect. *Avondale Shipyards, Inc. v. Insured Lloyd's,* 786 F.2d 1265, 1269-70 (5th Cir.1986) (quoting 6 Part 2 Moore's *Federal Practice* ¶ 56.20 [3.-4] ); *Travelers Indem. Co. v. Erickson's, Inc.,* 396 F.2d 134, 136 (5th Cir.1968). Although this circuit does not appear to have determined what procedures must be followed if a court should change its initial Rule 56(d) ruling and broaden the scope of a trial, the Second Circuit has stated that the parties should be afforded the opportunity to present evidence relating to the newly revised issue. *Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 386 (2d Cir.1989). In this case, although the court did not ask

---

[10]In his briefs filed with this Court, Massingill does not appear to challenge the award of attorney fees to the FDIC. Accordingly, and because we affirm the judgment for that agency, we leave that determination undisturbed.

explicitly whether the parties wished to present evidence with regard to Note 1, it did request additional authorities concerning that Note and asked the parties if they had anything further they wished to present. There appears to have been ample opportunity at that time for appellant to have objected to the procedure proposed by the court and to have requested a jury determination. Accordingly, the district court did not in any event abuse its discretion in the manner in which it re-opened the question of limitations for consideration.

III.

Appellant also asserts that the district court erred in ruling that Note 1 was not validly accelerated by the May 23, 1985, letter from Moncor which demanded payment of the entire amount of the Note. In so ruling, the district court applied Texas law as the law of the forum.[11] Because the court concluded that the acceleration was invalid, it determined, *inter alia,* that the Note was not in default until March 25, 1986, and, accordingly, that the FDIC's suit was timely filed.[12] The district court also found that

---

[11]We review *de novo* the district court's choice-of-law determination. *Arochem Corp. v. Wilomi, Inc.,* 962 F.2d 496, 498 (5th Cir.1992).

[12]If the district court correctly concluded that the May 23, 1985, letter did not constitute a valid acceleration of Note 1, appellant does not dispute that the FDIC's suit upon that Note was timely filed. Similarly, if the district court was incorrect in that the May 23, 1985, letter effectively did accelerate Note 1, the FDIC does not appear to challenge appellant's assertion that appellee's suit would be untimely with regard to that Note. *See FDIC v. Belli,* 981 F.2d 838, 840 (5th Cir.1993) (stating that "a cause of action 'accrues,' when 'it comes into existence,' *U.S. v. Lindsay,* [346 U.S. 568, 569, 74 S.Ct. 287, 288, 98 L.Ed. 300 (1953) ]," as, in that case, when the maker breached the note

"Moncor took action inconsistent with any continued acceleration or demand on Note 1, after the demand letter of May 23, 1985," and stated that "[t]he renewal and extension transaction [with regard to Renewed Note 2] concluded after the letter of May 23, 1985, establishes that Moncor abandoned any demand or acceleration as to Note 1."

                                        IV.

In this appeal, we are presented with, but need not discuss, a number of choice-of-law issues. Although federal law applies in accordance with 12 U.S.C.A. § 1819(b)(2)(A) (West 1989), neither party argues for the creation of a federal common-law rule as the substantive rule of decision in ascertaining whether or not Moncor's demand letter effected an acceleration; rather, they differ simply as to which state-law rule is the more appropriate.[13] *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 740, 99 S.Ct. 1448, 1464-65, 59 L.Ed.2d 711 (1979). Also, neither appellant Massingill nor the FDIC addresses the issue of whether we should use conflicts principles of the forum state or the federal common law of conflicts (whatever that may be) to determine which state's substantive law governs this non-diversity case. *See Detroit Edison Co. v. Pacific Ins. Co.,* 742 F.Supp. 287, 289 (M.D.N.C.1990) (holding that *Klaxon Co. v. Stentor Electric Mfg.*

---

and the bank demanded payment).

[13]Appellee, in its brief filed with this Court, does appear to attempt to utilize *D'Oench, Duhme,* and presumably 12 U.S.C. § 1823(e), to preclude appellant's claim of acceleration. However, that issue need not be reached in connection with this appeal.

*Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), does not bind courts in non-diversity, federal question cases, and that courts "should apply a federal common law of conflicts to select the proper state law" (citing with approval *Edelmann v. Chase Manhattan Bank, N.A.,* 861 F.2d 1291, 1294 (1st Cir.1988))), *aff'd without op.,* 944 F.2d 901 (4th Cir.1991). Instead, appellant, both before this Court and in the district court, maintains that this Court should utilize New Mexico law, pursuant to Texas conflict-of-law rules. Appellee FDIC does not address the choice-of-law issue in its briefs to this Court, other than to say that, as the law of the forum, Texas law should apply.

In any event, we need not make any choice-of-law decisions because, as we shall demonstrate, there is no conflict in the result reached in this case regardless of whether the substantive law of Texas or that of New Mexico is applied. *See FDIC v. Cardinal Oil Well Servicing Co., Inc.,* 837 F.2d 1369, 1370 n. 1 (5th Cir.1988).

V.

Under principles of Texas law, the district court correctly held that the May 23, 1985, letter did not constitute a valid acceleration of Note 1, thereby leaving Note 1 current until its default on March 25, 1986.

Texas law requires that a maker of a promissory note be afforded notice *of intent* to accelerate and an opportunity to cure the default. Any notice of acceleration is ineffective unless preceded by a proper notice of intent to accelerate. *Ogden v.*

12

*Gibraltar Sav. Ass'n,* 640 S.W.2d 232, 234 (Tex.1982). The two types of notice constitute separate rights of the borrower, and each is obligatory.

> Notice of intent to accelerate is necessary in order to provide the debtor an opportunity to cure his default prior to harsh consequences of acceleration and foreclosure. Proper notice that the debt has been accelerated, in the absence of a contrary agreement or waiver, cuts off the debtor's right to cure his default and gives notice that the entire debt is due and payable.

*Id.* Appellant never received a notice of intent and was not given the opportunity to cure his default prior to the letter of May 23, 1985. A "demand for payment of the overdue installment [must] be made prior to exercising the option to accelerate." *Allen Sales & Servicenter, Inc. v. Ryan,* 525 S.W.2d 863, 866 (Tex.1975). Appellant contends that, according to the terms of the Note, he waived all rights to notice.[14] Nevertheless, even if the terms of the waiver are sufficient to relinquish notice of acceleration, that waiver does not also surrender the borrowers' right to notice of intent to accelerate. Under Texas law, such a waiver must be expressed clearly and specifically. *See Shumway v. Horizon Credit*

_____

[14]Both Notes 1 and 2 provide in pertinent part:

> WAIVERS: Borrowers and any other Liable Party(ies) waive(s) presentment, protest, demand, notice of nonpayment, notice of dishonor, notice of protest and all other demands and notices with regard to this Note and any guaranty of it. They agree that any renewal of the Note, any extension or postponement of the time of payment or any other indulgence by Bank, any substitution, exchange or release of any Collateral or the addition or release of any party primarily or secondarily liable for payment of the Note may be made, without notice or consent, without prejudice to Bank and without releasing Borrower or any Liable Party.

13

*Corp.,* 801 S.W.2d 890, 894 and n. 7 (Tex.1991).

> Waiver of "notice", without referring specifically either to notice of acceleration or notice of intent to accelerate, is sufficient to waive notice of acceleration because the waiver relates to the right of acceleration in the note. It is not sufficient to waive notice of intent to accelerate because it is not clear from the acceleration provision or the waiver provision that the maker otherwise has the right to notice of intent to accelerate, in addition to notice of acceleration. Waiver of "notice", in only so many words, does not refer clearly and unequivocally either to notice of intent to accelerate, or to both types of notice.

*Id.* at 894 n. 7.

Moncor's May 23, 1985, letter also failed to accelerate Note 1 for a different reason. Texas law requires that a letter purporting to accelerate an installment debt be accompanied by further affirmative action enforcing the declared demand or acceleration in order to be effective. *See City Nat'l Bank v. Pope,* 260 S.W. 903, 905 (Tex.Civ.App. San Antonio 1924); 11 Am.Jur.2d *Bills & Notes* § 296 (1963). "[T]he intention to accelerate maturity must be evidenced by clear and unequivocal acts followed by affirmative action towards enforcing the declared intention." *Curtis v. Speck,* 130 S.W.2d 348, 351 (Tex.Civ.App.1939, writ ref'd); *see also Purnell v. Follett,* 555 S.W.2d 761, 764 (Tex.Civ.App. Houston 14th Dist.1977). In this case, Moncor's letter specifically stated that its reason for demanding payment of the balance upon the Notes was Massingill's refusal to renew the defaulted note, thereby implying that a reconsideration of that refusal would lead Moncor to withdraw its demand. Moreover, Moncor expressly indicated that, if payment of the balance upon both Notes was not rendered within ten days, it

14

would pursue legal action.  Moncor's failure so to do illustrates the lack of affirmative action necessary for a valid acceleration pursuant to Texas law.  Thus, for the several reasons indicated *supra,* there was no valid acceleration under Texas law in May 1985, and therefore the statute of limitations did not begin to run until the later default of both Note 1 and Renewal Note 2 in March 1986. *See Pope,* 260 S.W. at 905.

VI.

An analysis of this case under the law of New Mexico presents a more difficult problem.  That state's law in this area is not as developed as is that of Texas, and one of the parties to this case, the FDIC, failed completely to provide any New Mexico authorities in its briefs and argument to this Court.  Nevertheless, this Court has examined New Mexico law and concludes that, under New Mexico law as well as under Texas law, the district court was correct in determining that the May 23, 1985, letter did not trigger the statute of limitations in this case.

That letter most likely does satisfy the requirements of New Mexico law for a valid acceleration.  New Mexico does not seem to distinguish between a notice of intent to accelerate and a notice to accelerate.  In order for a holder of a note to accelerate the debt, the Supreme Court of New Mexico merely requires that

> the holder can [not] exercise the option [to accelerate] by some secret mental process on her part not evidenced by some form of affirmative action, such as by bringing suit thereon, or say, by entering the entire unpaid balance as immediately due and payable upon her books of account.  It is imperative that some act, signifying an intention to accelerate must appear....  There may be other possible affirmative acts *other than demand or notice* by which an option could be exercised

15

> under the language of this note; without doubt it could be exercised simply by bringing suit.

*Carmichael v. Rice,* 49 N.M. 114, 158 P.2d 290, 292 (1945) (emphasis added); *see also Comer v. Hargrave,* 93 N.M. 170, 598 P.2d 213, 214 (1979). The above-quoted language in *Carmichael* indicates that the Supreme Court of New Mexico in that case simply assumed that mere notice or demand for payment, such as that contained in Moncor's letter, suffices to exercise an optional acceleration clause such as that present in Note 1 and Note 2 in this case. Nothing in the case law indicates any more rigid requirements of action or of notice of the type called for by Texas jurisprudence, and none of the New Mexico decisions of which this Court is aware construes waivers of notice in the strict manner in which they are treated by Texas courts. Accordingly, under New Mexico law, Note 1 (and Note 2 as well) does appear to have been accelerated on May 23, 1985. *See* 32 Am.Jur.2d *Fed.Pract. & Proced.* § 295 (1982) (noting that "a decision of a state's highest court must be accepted by federal courts as authoritative on state law unless it can be said with some assurance that the state's highest court itself will not follow the decision in the future").

However, that does not end our inquiry. The district court found that any demand or acceleration by Moncor presented in its May 23, 1985, letter was abandoned in the light of Moncor's ensuing conduct, namely the renewal of the defaulted Note 2 and the subsequent unconditional acceptance of installments due in connection with both Note 1 and Renewed Note 2. We accept the findings of the district court unless they are clearly erroneous.

16

Fed.R.Civ.P. 52(a).

> Exercise of the option to accelerate is not irrevocable, and the holder of a note who has exercised his option of considering the whole amount due may subsequently waive this right and permit the obligation to continue in force under its original terms for all purposes, including the determination of when the statute of limitations begins to run on the right to sue.

11 Am.Jur.2d *Bills & Notes* § 296 (1963) (footnotes omitted). New Mexico does not appear to have passed upon the question of whether or how a holder may abandon or waive an already-exercised option to accelerate. "If a federal court must apply state law on an issue on which there are no state cases, it must attempt to predict what the state courts would hold if faced with the issue." 32 Am.Jur.2d *Fed.Pract. & Proced.* § 299 (1982). Locating no aid in New Mexico case law or statutes, we turn to the decisions of other states in order to discover whether they reinforce the general principle permitting waiver which is enunciated in American Jurisprudence, Second.

In examining the decisions of those state courts which have discussed the issue of waiver, we note that several courts have concluded in rather sweeping fashion that a holder's acceptance of "payment on delinquent interest and principal after notice of acceleration ... waive[s] its notice and reinstate[s] the loan." *United States v. Colombine Coal Co.,* 27 Utah 2d 140, 493 P.2d 983, 984 (1972); *see also Mitchell v. Federal Land Bank,* 206 Ark. 253, 174 S.W.2d 671, 674 (1943); *Bisno v. Sax,* 175 Cal.App.2d 714, 346 P.2d 814, 820 (1959); *Barday v. Steinbaugh,* 130 Colo. 10, 272 P.2d 657, 658 (1954) (asserting that holder's "mere inaction" in

17

accepting payment "after notice of election of acceleration ... [and] without notice to defendants that [holder] was not waiving her rights as to the acceleration" constituted waiver); *Pope,* 260 S.W. at 904-5.

Other courts, while not speaking quite so expansively, have permitted a determination of waiver where "the record shows a clear abandonment or waiver of any declared intention to take advantage of [acceleration]." *Wentland v. Stewart,* 236 Iowa 661, 19 N.W.2d 661, 664 (1945); *see also Andregg v. Sparrow,* 152 Kan. 744, 107 P.2d 739, 740-41 (1940) (discussing waiver for the purpose of limitations where delinquent debtor paid overdue interest and some interest not yet due); *Paul Londe & Assoc., Inc. v. Rathert,* 522 S.W.2d 609, 610-11 (Mo.Ct.App.1975) (upon surveying states' case law and noting that some allow for waiver upon "mere acceptance of a payment," the court concludes that "in order to prove an implied waiver the acts or omissions of the party alleged to have waived his rights must be so consistent with and indicative of the intention to relinquish the particular right or benefit that no other reasonable explanation is possible"); *cf.* Annotation, *Acceptance of past-due interest as waiver of acceleration clause in note or mortgage,* 97 A.L.R.2d 997 § 7 (1964) (listing cases in which waiver was determined to exist and those in which claims of a waiver were denied).

Those few cases in which courts have concluded that no waiver has been made are largely distinguishable from the instant case. For example, in *Oakland Nat'l Bank v. Anderson,* 81 Mich.App. 432,

18

265 N.W.2d 362, 364 (1978), the Court of Appeals of Michigan declined to consider an overdue payment made after acceleration a waiver, in part noting that the payment "did not cure all the defaults which existed at the time." In this case, Massingill and Christopher's renewal of the defaulted Note 2 after receipt of the May 23, 1985, Moncor letter did rectify the actual default of which Moncor complained. No payments in connection with Note 1 were missed until March 1986. Additionally, the bulk of the decisions in which a waiver has been determined not to exist deal with situations in which the holder of the note already had brought suit against the maker prior to the late payment. *See, e.g.,* 97 A.L.R.2d at 1015-16. We have been unable to locate any state decision which unequivocally forbids the possibility of waiver in circumstances analogous to those present before us.

In sum, because the dominant trend among those states which have considered the issue is to allow abandonment or waiver in situations such as the one before us, we hereby conclude that New Mexico likewise would so rule if it were confronted with that question. The district judge in this case, regardless of whether we apply the more generous or the more restrictive standard of proof necessary to establish a waiver, possessed ample evidence to reach his determination of waiver or abandonment. Moncor, in its demand letter of May 23, 1985, expressly stated that the reason for its demand was the refusal of Massingill to renew the defaulted Note 2. Upon that Note's subsequent renewal, Moncor declined to pursue its threat of legal recourse. Moreover, the effective date

19

typed on Renewed Note 2 is March 18, 1985, pre-dating both the predecessor Note 2 default and the demand letter from Moncor and illustrating the parties' intent that the renewal cancel any pre-existing default. Both Moncor and United continued to accept payments upon both Note 1 and Renewed Note 2 without exacting any penalty or reserving any rights with regard to acceleration. In the light of all of those circumstances, we cannot say that the district court's finding of abandonment was clearly erroneous.

## VII.

Massingill also complains that he unjustly was denied a jury trial with regard to the limitations issue. He argues that, when he waived his asserted right to jury determination, he so did in reliance upon the district court's narrowing of the issues for trial in the Rule 56(d) order. Consequently, Massingill contests the propriety of the district court's delivery of factual findings with regard to limitations.

"Fed.R.Civ.P. 39(a) prescribes that a jury waiver be embodied in one of two forms: either a written stipulation filed with the court or "an oral stipulation made in open court and entered in the record.' " *Tray-Wrap, Inc. v. Six L's Packing Co., Inc.,* 984 F.2d 65, 68 (2d Cir.1993). In this case, the parties agreed orally in court, and a "Minute Order" was entered into the district court record to that effect. Nowhere in the transcript of the proceedings or in that "Minute Order" is there any indication by appellant that the waiver was limited to those issues remaining for trial after the Court's Rule 56(d) order. More importantly,

20

appellant did not object at trial when the court stated that it was reconsidering the limitations defense and asked for post-trial briefs regarding that issue. In fact, appellant submitted the requested memorandum and made no mention of the jury issue until this appeal. *Cf. FMC Corp. v. AERO Indus., Inc.,* 998 F.2d 842, 845 (10th Cir.1993) (stating that defendant "waived any right he may have had to a jury trial by signing the pretrial order and participating in the bench trial").

> Whether or not [appellant's] silence is construed as a waiver, properly speaking, of its right to jury trial, the questions it now presents raise issues not raised before the trial court, and such issues will not ordinarily be considered on appeal. [Appellant's] silence on the matter at trial and until now certainly suggested to the trial court and opposing parties that it acquiesced in the court's proposed plan. [Appellant] may not now deny that it waived its right to a jury trial and demand a new trial only after it has lost on the merits and failed to make a timely objection before the district court. Therefore, all of the evidence having been heard, the findings of the trial court must be accepted unless clearly erroneous.

*Molett v. Penrod Drilling Co.,* 826 F.2d 1419, 1424 (5th Cir.1987), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989) (footnotes omitted) (denying party's entitlement to jury when that party "remained silent as the trial judge announced his intention to decide the third-party claims himself and to discharge the jury," *id.* at 1423). The requisite time for appellant's objection in the district court below was upon that court's indication that it wished to reconsider its earlier order. Accordingly, appellant's claim of error with regard to his waiver of a jury

21

trial is hereby denied.[15]

## VIII.

With regard to Renewed Note 2, appellant claims that the district court improperly precluded him from raising his affirmative defense that the FDIC unjustifiably impaired the collateral securing that Note. Section 1823(e)[16] does not "protect the FDIC against the consequences of its own conduct with respect to the asset after acquiring it." *FDIC v. Blue Rock Shopping Center, Inc.,* 766 F.2d 744, 753 (3d Cir.1985).

Massingill claims that he is entitled to assert that defense because he signed Renewed Note 2 as an accommodation maker, or surety, not as a co-maker. However, the face of that Note indicates that both he and Christopher signed the instrument as co-makers; any oral agreements to the contrary would be barred by § 1823(e). *See Langley v. FDIC,* 484 U.S. 86, 91-92, 108 S.Ct. 396, 401-02, 98 L.Ed.2d 340 (1987).[17] Accordingly, the district court

---

[15]Additionally, appellant's claim that the testimony of the FDIC account officer was admitted erroneously by the trial judge requires little comment. There was nothing improper in the officer's testimony, as he was a subsequent custodian of the Bank files concerning the Notes and was therefore competent to testify regarding their contents. *See Miss. River Grain Elev., Inc. v. Bartlett & Co., Grain,* 659 F.2d 1314, 1318-19 (5th Cir.1981).

[16]*See* note 6, *supra,* for text of statute.

[17]In *Langley,* the Supreme Court commented:

One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.... Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

22

correctly determined that Massingill signed Renewed Note 2 as a co-maker.

There may be a question as to whether Texas law denies to a co-maker the defense of impairment of collateral. *See FDIC v. Blanton,* 918 F.2d 524, 530 (5th Cir.1990). Under New Mexico law, a co-maker in Massingill's situation seemingly may raise that defense and obtain discharge "to the extent the impairment causes [him] to pay more than [he] would have been obliged to pay, taking into account the rights of contribution, if impairment had not occurred." N.M.Stat.Ann. § 55-3-605(f) and offic. cmt. 7 (Michie 1992). However, we need not tarry in connection with any difference between Texas and New Mexico case law in this regard in the light of this circuit's decision in *United States v. Unum, Inc.,* 658 F.2d 300 (5th Cir.1981). In that case, Judge Politz employed a "uniform [federal] rule" to determine that "a maker of a note, as opposed to a surety, is not entitled to invoke this defense" of impairment of collateral. *Id.* at 304. Judge Politz noted that Texas and Alaska, the states at issue in that case, "have both adopted the Uniform Commercial Code (UCC)," but, in any case,

> we are not constrained to follow any modifications to the model UCC made by a forum state, nor are we bound by decisions of the forum state courts. We opt to follow the model UCC and those cases which best supplement the UCC and further its purposes and design.

*Id.* at 304 and n. 2.

For that reason, we affirm the district court's decision to

---

*Id.*

prevent appellant from asserting a defense of impairment of collateral in this case.

IX.

The final issue presented for resolution in this appeal concerns the appropriate rate of interest to be applied to Note 1 and Renewed Note 2. The district court accepted the FDIC's contention, as a matter of law, that the agency properly could apply the prevailing prime rate of the bank which assumed the Notes, *i.e.* United Bank, in lieu of the presently unascertainable "Base Lending Rate" of the defunct Moncor Bank, in order to determine the rate of interest due upon the Notes. We agree.

As a preliminary matter, we note that appellant Massingill relies entirely upon cases interpreting Texas law in support of his claim. Appellee FDIC also cites exclusively to decisions construing Texas law.[18]

Art. 5069-1.03, the Texas statute relied upon by appellant, designates that:

> When no specific rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

---

[18]Massingill additionally argues that, in this case, the result reached under the applicable New Mexico statute would be "analogous" to that gleaned from the relevant Texas code provision. *Compare* N.M.Stat.Ann. § 55-3-112 (Michie 1992) *with* Tex.Rev.Civ.Stat.Ann. art. 5069-1.03 (West 1993). Appellant's characterization of New Mexico law seems questionable. *See* N.M.Stat.Ann. § 56-8-3 (Michie 1983) (providing that the judgment rate of interest "shall not be more than fifteen percent annually," substantially higher than the six percent prescribed by the Texas statute).

24

In this case, both Note 1 and Renewed Note 2 provide that interest shall be computed until paid as follows:

A variable rate equal to 1/27 per year above Bank's Base Lending Rate. Base Lending Rate is the rate set from time to time by Bank, below which loans will not usually be made.

Here, the parties to Note 1 and Renewed Note 2 agreed upon an applicable rate of interest; unfortunately, due to the unanticipated failure of Moncor Bank, that rate no longer can be applied. Accordingly, Art. 5069-1.03 does not apply. *See Blanton,* 918 F.2d at 532; *In Re Moore/Minshew/Shea,* No. 90-41512, slip op. at 7 (Bankr.E.D.Tex. Aug. 25, 1992).

Texas law provides that "a specific prematurity interest rate continues after maturity when the contract is silent as to postmaturity interest." *Blanton,* 918 F.2d at 532 (5th Cir.1990). No provision for postmaturity interest appears upon the face of the Notes. Thus, this Court must determine whether the prematurity rate is ascertainable and, if so, must utilize that rate.

Several courts have allowed the substitution of an assuming bank's prime rate for that of the defunct lender. *See Blanton,* 918 F.2d at 532 and n. 10; *FDIC v. La Rambla Shopping Center, Inc.,* 791 F.2d 215, 223 (1st Cir.1986); *FDIC v. Condo Group Apts.,* 812 F.Supp. 694, 699 (N.D.Tex.1992); *FDIC v. Cage,* 810 F.Supp. 745, 747 (S.D.Miss.1993); *In Re Moore/Minshew/Shea,* slip op. at 1, 6. The fact that the Notes in question refer to Moncor's "Base Lending Rate" rather than to its prime rate does not adversely affect the FDIC's position. Black's Law Dictionary defines the prime rate as "the most favorable interest rates charged by a commercial bank on

25

short-term loans to its best (*i.e.* most credit worthy) customers." Black's Law Dictionary 813 (6th ed. 1990). Both Note 1 and Renewed Note 2 define the Base Lending rate as the "rate set from time to time by Bank, below which loans will not usually be made." If there is any difference between the two rates, such difference would reasonably be expected to render the base rate higher than the prime; thus the FDIC's use of the latter in this case redounds to the benefit of appellant, not the FDIC. *Cf. In Re Moore/Minshew/Shea,* slip op. at 3 (using terms "base" and "prime" interchangeably); *Amberboy v. Societe de Banque Privee,* 831 S.W.2d 793, 803 (Tex.1992) (Doggett, J., concurring and dissenting) (defining "Basic Rate" in that particular case as "equal to the sum of the prime interest rate ... plus 2 percent (2%) per annum (emphasis omitted)).

In the light of the foregoing discussion, this Court need not decide whether the term "Base Lending Rate" carries a fixed meaning in the context of all commercial transactions. We decide merely that, in this case, use of United Bank's prime rate by the FDIC is a permissible, reasonable alternative which, if it does differ from Moncor's Base Lending Rate, more likely than not errs in favor of appellant.[19]

---

[19]In several opinions permitting substitution, the courts have noted in support of their decisions that the prime rate of the substituted bank was "analogous" to that of the failed institution, *Blanton,* 918 F.2d at 532; that the substituted rate was "commonly used," *Cage,* 810 F.Supp. at 747; or that the substituted lender "uses the same methods of calculating its own prime" as did the defunct bank. *In Re Moore/Minshew/Shea,* slip op. at 1. *See also La Rambla,* 791 F.2d at 223 (commenting that the rate of the substituted bank "was the same" as the rate of

X.

For the reasons set forth *supra* in this Opinion, we hereby affirm the judgment of the district court in all respects.

AFFIRMED.

---

the failed bank).  *But see Condo Group Apts.,* 812 F.Supp. at 699 (no mention of any similarity between the substituted and the failed banks' rates).  As noted *supra,* appellant's primary contention with regard to the propriety of the use of United's interest rate centers upon the perceived disjuncture between a "Base Lending Rate" and a prime rate.  To the extent that appellant also claims a material difference between the prime rates of Moncor and of United, we view that claim to have no merit.  Although we would prefer the record in this case to have been more clear, there is no evidence that Moncor and United employed dramatically different methods of calculating their prime rates or that their rates varied to any significant degree.  Both banks are or were located in New Mexico and presumably competed in similar markets.  At trial, the FDIC account officer testified that application of the assuming bank's rate, upon the re-acquisition of the Notes from that bank, was the "usual custom" of the FDIC, and noted that the FDIC simply applied the same rate that United itself had utilized while it held Note 1 and Renewal Note 2—a rate to which it does not appear either Christopher or Massingill objected at the time.  *Cf. In Re Moore/Minshew/Shea,* slip op. at 6 (stating that the use of the failed bank's prime rate in the note at issue in that case "was not a material aspect of the contract").

27