In re WCI STEEL, INC.,
et al., Debtors.

WCI Steel, Inc., Plaintiff,

v.

Seaway Marine Transport, Defendant.

Bankruptcy No. 03–44662.
Adversary No. 03–4455.

United States Bankruptcy Court,
N.D. Ohio.

Sept. 28, 2005.

Christine Pierpont, Cleveland, OH, for plaintiff.

Thomas B. Radom, Birmingham, MI, for defendant.

## MEMORANDUM OPINION

KAY WOODS, Bankruptcy Judge.

This cause is before the Court on the parties' cross motions for summary judgment on the issues in an adversary proceeding commenced by WCI Steel, Inc. ("WCI") against Seaway Marine Transport ("Seaway") seeking a determination of the validity and priority of maritime liens and for damages for unjust enrichment. Each of the parties filed responses and reply briefs to the motions for summary judgment.[1]

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334(b). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408 and 1409. Seaway submitted to this Court's jurisdiction by making an appearance in the underlying bankruptcy proceeding and does not contest that this Court has personal jurisdiction over it. (Seaway's Answer to First Amended Complaint ¶ 7.) This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(k). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR.P. 7052.

### I. STANDARD OF REVIEW

The procedure for granting summary judgment is found in FED.R.CIV.P. 56(c),

---

1. WCI correctly notes in a footnote in its reply brief that reply briefs were not to be submitted without leave of the Court, which neither party obtained. The Court has read all of the relevant documents, including the reply briefs, but does not look with favor on the practice of submitting reply briefs.

made applicable to this proceeding through FED. R. BANKR.P. 7056, which provides in part that,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. BANKR.P. 7056(c). Summary judgment is proper if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it could affect the determination of the underlying action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Tenn. Dep't of Mental Health & Retardation v. Paul B.,* 88 F.3d 1466, 1472 (6th Cir.1996). An issue of material fact is genuine if a rational fact-finder could find in favor of either party on the issue. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 224 B.R. 27 (6th Cir. BAP 1998). Thus, summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, the movant bears the initial burden to establish an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 198 (6th Cir. BAP 1998). The burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 590, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, in responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989) (quoting *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505). That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *Street,* 886 F.2d at 1479.

## II. *ISSUE*

The parties have briefed two issues for the Court, as follows:

1. Did Seaway forfeit its maritime liens over certain iron ore pellets ("Pellets") when it delivered such Pellets at the contractual destination?

2. Is WCI entitled to the repayment of the One Hundred Thousand Dollar ($100,000.00) adequate protection payment, ordered by this Court, if the liens are held to be invalid?

The parties also briefed the choice of law issue.[2]

## III. *FACTS*

The material facts in this case are not in dispute. WCI is a corporation incorporat-

---

**2.** Seaway also contends that the law of the forum (U.S. law) controls the ranking of liens. This Court has not addressed the issue of ranking because it holds that Seaway does not have a valid lien with respect to either of the two shipments of Pellets.

ed under the laws of Ohio with its principal place of business at 1040 Pine Avenue, SE, Warren, Ohio. WCI is in the business of producing steel. Seaway is a Canadian company with its principal office located at 20 Corporate Park Drive, Suite 300, St. Catharines, Ontario L2S 3W2. Seaway is a company that operates transport vessels on the Great Lakes, St. Lawrence River and waterways of Eastern Canada.

On October 19, 2001, WCI and Seaway entered into a Contract of Affreightment ("Contract"). Pursuant to the Contract, Seaway agreed to transport Pellets purchased by WCI from Point Noire, Quebec, Canada to Pinney Dock in Ashtabula, Ohio. Pinney Dock is a dock and warehouse facility that receives iron ore shipments for WCI and is owned and operated by a third party.

The Contract provides that WCI is required to pay Seaway within five days of the loading of the Pellets.[3] The Contract provided Seaway with rights if WCI did not meet its payment obligations. Specifically, the contract provides:

> Freight shall be deemed earned and payable on receipt of the cargo by Carrier and shall be paid in any event, cargo lost or not lost. Provided the Shipper is not in default, freight charges may be paid, without interest, within five (5) days of completion of loading. Time shall, in that respect, be of the essence and if the Shipper fails to pay freight charges within five (5) days:
>
> i) Carrier shall be entitled to suspend the performance of this Agreement

until such time as all amounts owed by Shipper have been paid or security in respect thereof has been provided;

> ii) Carrier shall be entitled to require, in the case of future shipments under this Agreement, that freight and other charges be paid in advance.

(Contract 7.)

Furthermore, the Bill of Lading, expressly incorporated into the Contract, contained a lien provision, which provides:

> The carrier shall have a lien on the cargo for any amount due from the merchant, in respect of freight, salvage, general average or special charges, whether in respect of the cargo or in respect of other cargos shipped by the merchant or other contracts made by the merchant, and shall be entitled to withhold delivery of the cargo until such amounts have been paid or security in respect thereof has been provided.

(Bill of Lading 14.)

Under the Contract, any dispute between the parties was to be resolved by a court or arbitrator using Canadian law. The Contract provides:

> (a) This Contract and the rights, duties, privileges., [sic] limitations, and defenses of Carrier and Shipper shall be governed by and construed according to the laws of the Province of Ontario and the laws of Canada. . . .

(Contract 10.) In addition to the choice of law provision in the Contract, the parties

---

**3.** In its Reply Brief, Seaway—for the first time—alleges that the Contract was modified to require WCI to pay Seaway within ten days of the loading of the Pellets. WCI alleges that the ten day reference is probably a typographical error. As WCI correctly points out, Seaway has taken several disparate positions during the summary judgment process regarding when payment was due under the Contract. (WCI's Reply in Further Support of its Motion for Summary Judgment at 5–6.) Because both parties have acknowledged in their pleadings that payment was due five days after loading, which is also the plain language of the Contract, this Court finds that five days after loading was the relevant time period for payment.

included a choice of law provision in the Bill of Lading, which states:

> In the case of shipments originating in Canada, all disputes or claims arising under this bill of lading, including disputes in connection with loss of or damage to the cargo, shall be subject to the exclusive jurisdiction of the Federal court of Canada and shall be governed by Canadian maritime law.

(Bill of Lading 4.)

Seaway completed loading twenty-eight thousand eight hundred sixteen (28,816) MTS Pellets (valued at Two Hundred Fifteen Thousand One Hundred Two and 95/100 Dollars ($215,102.95)) on the M/V JEAN PARISIEN on September 5, 2003 and twenty-three thousand seven hundred forty-five (23,745) MTS Pellets (valued at One Hundred Ninety Thousand Four Hundred Sixty–Five and 50/100 Dollars ($190,-465.50)) on the M/V ALGOSTEEL on September 6, 2003. The Pellets on the M/V JEAN PARISIEN arrived at Pinney Dock in Ashtabula, Ohio on September 9, 2003 and the Pellets on the M/V ALGOSTEEL arrived at Pinney Dock on September 10, 2003. Seaway discharged both shipments of Pellets at Pinney Dock. At no time prior to discharge did Seaway notify WCI or the wharfinger or warehouseman,[4] in writing or otherwise, that it was conditionally releasing the Pellets subject to WCI's obligation to pay for the Pellets. (Seaway Answer to Interrog. No. 3.) Instead, Seaway discharged the Pellets in accordance with Seaway's and WCI's standard operating practices under the Contract and Bill of Lading. (Seaway Answer to Interrog. No. 3.)

On September 16, 2003, WCI filed for protection pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. WCI failed to pay Seaway for these two shipments in accordance with the terms of the Contract. As a result, on September 16, 2003—seven and six days, respectively, after Seaway discharged the Pellets—Seaway served WCI and Pinney Dock two Notices of Claims of Lien, under general maritime law, against the Pellets delivered on September 9 and September 10, 2003 to Pinney Dock.[5] As of the date of service, all of

---

**4.** Section 17 of the Bill of Lading provides that: "The cargo is to be received by the merchant ... at the port of discharge as soon as the vessel is ready for discharge...." The definition of "merchant" in the Bill of Lading means "shipper, ... person entitled to possession of the cargo and their respective servants, agents and independent contractors." Thus, it appears that Pinney Dock, although operated by a third party to receive Pellets on behalf of WCI, was the "agent/independent contractor" for WCI and, consequently, was included within the definition of "merchant" for purposes of the Contract.

**5.** Seaway initially asserts in its motion for summary judgment that the Contract provided that payment for the cargo was due five days after delivery. Seaway alleged that it "waited five days for payment by WCI for its September 9th and 10th, 2003 deliveries of the Cargo. On September 16, 2003, the first day on which WCI was in default of its payment obligations for both shipments, Seaway

sent Notices of Claims of Lien to WCI. Thus, Seaway took no actions after the delivery of the Cargo inconsistent with its rights under the Contract to maintain a lien on the Cargo...." (Seaway's Motion for Summary Judgment at 6.) Seaway subsequently changed its position and acknowledged that the Contract provides for payment five days after completion of loading. (Seaway's Response in Opposition to WCI's Motion for Summary Judgment at 10.) The timing of Seaway's Notices of Claims of Lien appears to relate solely to the timing of WCI's filing of its bankruptcy petition and not in recognition that September 16 was the first day that WCI was in default for payment of "both" shipments. Seaway would have more credibility in making this assertion if it had filed separate notices when WCI was in default of payment for each shipment. There is nothing in the record to indicate whether WCI had a history of paying for shipments within five days of loading or if it was ever late in making such payments.

the Pellets remained in a warehouse at Pinney Dock.

After WCI filed for bankruptcy, Seaway refused to continue providing transport services under the Contract unless WCI paid a portion of the alleged liens. This Court, on October 2, 2003, issued an Order Authorizing Debtors to Provide Adequate Protection to Seaway and Authorizing (a) Payment of Maritime Claim, (b) Granting Replacement Liens in Existing or New Inventory Located at Pinney Dock in Respect of Maritime Claim; (c) Authorizing and Directing Applicable Banks and Financial Institutions to Receive, Possess and Pay any and all Checks and Other Transfers Related to Such Claim ("Adequate Protection Order"). The Adequate Protection Order, as an inducement to Seaway to continue providing shipping services under the Contract, authorized WCI to make payments in three monthly installments of One Hundred Thousand Dollars ($100,000.00) beginning on or before October 31, 2003 and a final payment of One Hundred Five Thousand Five Hundred Sixty–Eight and 45/100 Dollars ($105,-568.45) on or before January 31, 2004. The Adequate Protection Order specifically states:

> Nothing in this Order shall be construed as (a) prejudicing the rights of the Debtors or any party in interest to dispute or contest the amount or validity of Seaway's Maritime Claim and/or the amount, validity and priority of its Maritime Lien; (b) affecting or modifying the rights or obligations of Seaway and Debtors under the Contract of Affreightment with respect to postpetition shipments; or (c) deeming to constitute postpetition assumption of the Contract of Affreightment between the Debtors and Seaway pursuant to section 365 of the Bankruptcy Code, or (d) prejudicing the rights of Seaway to seek assumption or rejection of the Contract of Affreight-

ment or any other rights Seaway has under the Bankruptcy Code.

(Adequate Protection Order 6.)

Pursuant to the Adequate Protection Order, WCI made one monthly installment payment towards the asserted maritime lien in the amount of One Hundred Thousand Dollars ($100,000.00), while reserving the right to dispute or contest the amount and/or validity of the liens as provided by the Adequate Protection Order.

WCI commenced this adversary proceeding on December 10, 2003 seeking: (1) a determination of the validity of Seaway's claims; (2) a declaratory judgment declaring the alleged maritime liens invalid; and (3) the recoupment of the One Hundred Thousand Dollar ($100,000.00) adequate protection payment. WCI asserts, in making these claims that: (i) Canadian law applies; (ii) the Pellets were released without condition; and (iii) the adequate assurance payment was made subject to WCI's right to dispute the payment.

Seaway asserts that: (1) the law of the United States applies; (2) the Pellets were conditionally released pursuant to the Contract and Bill of Lading; and (3) the adequate assurance payment was voluntarily made and may not be recouped.

## IV.  LEGAL ANALYSIS

### A.  Choice of Law

■ Federal law controls the interpretation of a maritime contract as long as the dispute is not inherently local. *Norfolk S. Ry. Co. v. James N. Kirby*, 543 U.S. 14, 125 S.Ct. 385, 392, 160 L.Ed.2d 283 (2004).

■ In the instant case, WCI and Seaway contracted to ship, via transport vessels, Pellets from Point Noire, Quebec to Ashtabula, Ohio. There is no question that this Contract consists of maritime contract

due to Seaway's exclusive use of vessels on the various international waterways. Furthermore, this Contract is not inherently local because the Contract involves a Canadian company and a company incorporated under the laws of Ohio and the shipment of cargo from Canada to the United States. As a result, this Court must and will use federal contract law to determine the nature of the Contract and the interpretation thereof.

■ Maritime contracts must be treated like any other contract. *Id.*, 125 S.Ct. at 397. It is well founded in contract law that a contract must be entered into by capable parties and the agreement must contain the elements of mutual assent and consideration. *See* RESTATEMENT (SECOND) OF CONTRACTS, Ch. 2; 3; 4 (1981). In addition, the terms of the contract must be read consistent with the intent of the parties and where the terms have a plain and obvious meaning, all construction, in contravention of that meaning, should be disregarded. *Norfolk S. Ry.*, 125 S.Ct. at 397. However, in determining the validity of a choice of law provision, one must consider the following factors: illegality, bad faith, substantial injustice, unreasonableness, the oppressive use of superior bargaining power, repugnance to the laws of the forum and/or violation of American public policy. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 187 (1971); *Blauschild v. Smartcars, Inc.*, No. 1:92 CV 0308, 1992 U.S. Dist. LEXIS 21755 (N.D.Ohio, Dec. 2, 1992); *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 767–69 (D.C.Cir. 1992). These factors should be highly scrutinized because, under American law, choice of law provisions are usually honored. RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 187; *see also Hawkspere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir.2003); *Milanovich*, 954 F.2d at 767.

■ The parties do not dispute that there is a valid contract in the current case; they differ, however, on what law controls in determining whether Seaway has a valid maritime lien. The question is whether the choice of law provisions in the Contract and Bill of Lading control regarding the validity of the maritime lien. The choice of law clause in the Contract reads:

> (a) This Contract and the rights, duties, privileges., [sic] limitations, and defenses of Carrier and Shipper shall be governed by and construed according to the laws of the Province of Ontario and the laws of Canada. . . .

(Contract 10.) To further stress that Canadian law applies, the parties also restated their choice of law in the Bill of Lading. This provision reads:

> In the case of shipments originating in Canada, all disputes or claims arising under this bill of lading, including disputes in connection with loss of or damage to the cargo, shall be subject to the exclusive jurisdiction of the Federal court of Canada and shall be governed by Canadian maritime law.

(Bill of Lading 4.)

These provisions evince the parties' intent that Canadian law should apply in the event of a contractual dispute. Reading these provisions in any other manner would be contra to the plain and obvious meaning of the provision; consequently, any interpretation that excludes Canadian law from governing a dispute is in clear contravention of the meaning of the terms of the Contract and should be disregarded. *Norfolk S. Ry.*, 125 S.Ct. at 397. The choice of law clauses could only be defeated if the Contract was subject to one of the aforementioned factors that invalidate a choice of law provision. However, neither party has demonstrated or even suggested

that either the Contract or the Bill of Lading was subject to illegality or bad faith, results in substantial injustice, is unreasonable, the result of oppressive or superior bargaining power, repugnant to the laws of the forum and/or against American policy. Accordingly, the parties' choice of law (*i.e.*, Canadian law) governs the rights and obligations of the parties to this Contract, including the determination of the validity of Seaway's asserted maritime lien.

Seaway insists that, even if the Court uses Canadian law as the starting point, this is not the end of the choice of law analysis. Seaway contends that there is a significant gap in Canadian law relating to the doctrine of "constructive possession," and, therefore, the law of the United States should be the controlling substantive law on this issue.

The Court rejects this proposition. Canadian law is well developed in the area of maritime liens even though it may not cover every dispute with an identical case and/or a statute directly on point. Canadian law is well developed and has the ability through the Canadian Shipping Act of 1985 and Canadian common law to govern almost any maritime lien dispute. *See Lloyds Bank of Canada v. Lumberton Mills Ltd.*, [1989], 2 W.W.R. 360 (B.C.C.A.); *Coastal Equip. Agencies Ltd. v. Ship "Comer" (The)*, [1970] Ex. C.R. 13. As a result, this Court will not apply the law of the United States in disregard of the clear intent of the parties, as evidenced by the Contract and Bill of Lading, but will apply Canadian law to resolve this dispute.

Furthermore, both parties are sophisticated and knowledgeable in the area of contract law. They knew the benefits and burdens of their bargain when they entered into the Contract, including the implications of the choice of law provision in the Contract. To allow Seaway to disavow the choice of law provision that it drafted,[6] and insist upon the application of another jurisdiction's law when the contractual choice of law is not favorable to it, is unjust. Such a result would be against public policy, in that the choice of law provision would be read out of the Contract. Furthermore, the Contract would no longer provide uniform treatment and predictable outcome to disputes that arise under the Contract.

Therefore, this Court concludes that, pursuant to the unambiguous provisions of the Contract and Bill of Lading, Canadian law applies.[7] This Court further concludes, however, that application of the law of the United States would not result in any different conclusion regarding the validity of the maritime lien.

### B. *Liens*

Under Canadian general maritime law, a shipper has a possessory lien in the cargo of a vessel for freight.[8] *See Comeau's Sea*

---

**6.** The choice of law provision on the Bill of Lading appears on Seaway's printed form. WCI asserts and Seaway does not contest that Seaway drafted the Contract. (WCI's Reply in Further Support of its Motion for Summary Judgment at 3 n.5.)

**7.** It should be noted that the same result would occur if the Contract was interpreted under Canadian law. This is due to the fact that Canada's law on contract interpretation is virtually identical to the law of the United States. It requires that one apply the literal meaning to a word or term unless to do so would result in absurdity. *See Gadbois v. Bonte Foods, Ltd.*, [1988] 94 N.B.R (2d) 21 at P 34. Furthermore, the parties are presumed to have intended the ordinary meaning of a word. G.H.L. Fridman, The Law of Contract in Canada 492 (4th ed.1999).

**8.** This is also true under the law of the United States. *See 4,885 Bags of Linseed*, 66 U.S. 108, 115, 1 Black 108, 17 L.Ed. 35 (1861) ("It is true, that such a delivery, without any condition or qualification annexed, would be a

*Foods Ltd. v. Frank and Troy (The),* [1971] F.C. 556, 558; *Imperial Oil Ltd. v. Petromar Inc.,* [2002] F.C. 190; WILLIAM TETLEY, MARITIME LIENS AND CLAIMS, 2d Ed., Blais, Montreal, 1998 at 752, 754, 759, 762–63. By maintaining possession of the cargo, a vessel may maintain priority to its claim. *Comeau's Sea Foods Ltd., F.C. at 558.* The right to retain cargo and/or a lien may also be expressed in the shipping contract. Possession of the cargo may last until the demands of the lienholder are satisfied. *Id.* A possessory lien is discharged at the moment the vessel surrenders the cargo to a warehouseman or a wharfinger. *Canadian Shipping Act,* R.S. 1985, c. S–9, s. 597. However, if the owner of the ship gives the warehouseman or wharfinger notice, in writing, that the cargo is to remain subject to a lien or other freight charges as they were prior to discharge, then the warehouseman or wharfinger shall retain the cargo subject to that lien. *Id.* If a shipper fails to meet the requirements set forth in Section 597 of the Canadian Shipping Act, the shipper can bring an *in rem* action. *See Imperial Oil Ltd.,* F.C. at 205–06. The claimant in an *in rem* action does not receive any privilege or preference in a bankruptcy proceeding and will be treated the same as an ordinary unsecured creditor. *Coastal Equip. Agencies Ltd.,* Ex. C.R. at 31.

Furthermore, parties entering into a shipping contract can provide a provision in the contract granting the shipper a lien on the cargo.[9] Under either Canadian or United States law, these clauses will be interpreted using the literal meaning of the words unless to do so would result in absurdity. *Gadbois v. Bonte Foods, Ltd.,* [1988] 94 N.B.R (2d) 21 at P 34.9; *see also Norfolk S. Ry.,* 125 S.Ct. at 397.

■ There is no doubt that Seaway had a possessory lien on the Pellets for freight under Canadian general maritime law. *Comeau's Sea Foods Ltd, F.C. at 558.* However, this lien under general maritime law is only valid as long as Seaway held possession of the Pellets. As a result, when Seaway discharged the Pellets at Pinney Dock—without providing written notice prior to discharge that the Pellets were relinquished subject to the lien—the possessory lien on the Pellets terminated. *Canadian Shipping Act,* R.S.1985, c. S–9, s. 597.

In order for Seaway to protect its lien, under Canadian law, it would have had to notify the warehouseman or wharfinger, in writing, that it was discharging the Pellets subject to the lien or contract with WCI. *Id.* Seaway admits that at no time prior to discharge did it notify WCI or the warehouseman or wharfinger that it was releasing the Pellets subject to a lien. (Seaway's Answer to Interrog. No. 3.) Seaway states that it released the Pellets in accordance with Seaway's and WCI's standard operating practices under the Contract and Bill of Lading and in accordance with the lien provisions therein. (*Id.*)

■ In addition to the general maritime lien, Seaway had a lien pursuant to section 14 of the Bill of Lading, which was incorporated into and became a part of the Contract.

The carrier shall have a lien on the cargo for any amount due from the merchant, in respect of freight, salvage, general average or special charges, whether in respect of the cargo or in respect of other cargos shipped by the merchant or

waiver of the lien; because, as we have already said, the lien is but an incident to the possession, with the right to retain.")

9. This is equally true under American law. *See Atlantic Richfield Co. v. Good Hope Refineries, Inc.,* 604 F.2d 865 (5th Cir.1979).

other contracts made by the merchant, and shall be entitled to withhold delivery of the cargo until such amounts have been paid or security in respect thereof has been provided.

(Bill of Lading ¶ 14.) The parties concede that there is no Canadian law that directly interprets this exact contractual language. The language in section 14 conferring this lien is not inconsistent with the requirement that Seaway retain possession of the Pellets for the lien to be effective.[10] Seaway contends that the second half of that section—regarding withholding delivery—is a second right in addition to the grant of the lien. This Court finds that a better construction of that language is as a remedy that allows the possessory lien to continue.[11] Otherwise, consistent with section 17 of the Bill of Lading, Seaway would have no choice but to immediately discharge the cargo and relinquish the lien. Section 17 of the Bill of Lading provides that: "The cargo is to be received by the merchant . . . at the port of discharge as soon as the vessel is ready for discharge. . . ."

Seaway is a sophisticated company well acquainted with the intricacies of maritime law. Seaway could have satisfied Section 597 of Canadian Shipping Act by notifying the warehouseman or wharfinger at Pinney Dock that it was discharging the Pellets pursuant to a lien (i.e., conditional discharge). Alternatively, the parties could have negotiated a nonpossessory lien provision in the Contract or Bill of Lading.[12] Moreover, Seaway could have retained possession of the Pellets until it received full payment from WCI.[13] However, Seaway took none of these actions. Instead, it: (1) relinquished the Pellets before payment; (2) failed to negotiate or draft a nonpossessory lien provision in the Contract; and (3) failed to inform Pinney Dock that it was conditionally relinquishing the Pellets.

Although Seaway had many options to protect its interest in the Pellets, it failed to avail itself of any of them. Now Seaway's only remedy is to bring an *in rem* action; however, this would be unavailing because such action would only provide protection equal to an unsecured creditor. *Coastal Equip. Agencies Ltd.*, Ex. C.R. at 31.

As a result, this Court holds that Seaway relinquished its possessory lien when it discharged the Pellets at Pinney Dock without providing prior written notice that

---

**10.** This provision must be given its literal meaning. *Gadbois*, 94 N.B.R (2d) 21 at P 34.9; see also *Norfolk S. Ry.*, 125 S.Ct. at 397. The literal meaning of this provision is that Seaway maintained a possessory lien for freight, salvage, general average or special charges, on the Pellets aboard the M/V ALGOSTEEL and M/V JEAN PARISIEN and with respect to any unpaid charges relating to other shipments. The lien provision specifically states, Seaway is "entitled to withhold delivery of the cargo until such amounts have been paid or security in respect thereof has been provided." (Bill of Lading ¶ 14.) Accordingly, Seaway only held a possessory lien and that lien was terminated upon discharge of the Pellets. No provision of the Contract or the Bill of Lading gives Seaway a nonpos-

sessory lien against the Pellets or any other cargo owned by WCI.

**11.** See also footnote 14, *infra*.

**12.** Examples of nonpossessory lien provisions can be seen in *Lloyds Bank of Canada v. Lumberton Mills Ltd.*, [1989], 2 W.W.R. 360 (B.C.C.A.) and in *Atlantic Richfield Co. v. Good Hope Refineries, Inc.*, 604 F.2d 865, 872 (5th Cir.1979).

**13.** This appears especially true here, where WCI's payment for the first shipment was due on the date that the second shipment was unloaded. Seaway could have held the ALGOSTEEL shipment "hostage" until payment was made for the shipment delivered the previous day.

the Pellets were being discharged subject to a lien.

▮▮▮▮ The law of the United States is similar to Canadian law and does not mandate that this Court reach a different result. Even if the law of the United States applied, Seaway does not have a valid non-possessory lien against the Pellets. Under the law of the United States, a shipowner holds a maritime lien on cargo. *4,885 Bags of Linseed*, 66 U.S. 108, 111–12, 1 Black 108, 17 L.Ed. 35 (1861). The lien with respect to such cargo is possessory; thus, it is relinquished if the cargo is unconditionally discharged. *Id.* However, the maritime lien will remain in effect if the cargo is conditionally discharged. *Id.* To determine if the cargo is conditionally discharged, one may look to the understanding of the parties. *Id.*, 66 U.S. at 114. The factors to determine if the cargo is conditionally discharged must be clear and strictly construed. *Atlantic Richfield Co.*, 604 F.2d at 872–73 (5th Cir.1979).

Seaway's maritime lien against the Pellets continued as long as it either maintained possession of the Pellets or it did not unconditionally release them. Seaway had not received payment from WCI for either shipment of Pellets by the time the vessels reached Pinney Dock. As a result, Seaway had the following options to maintain a lien on the Pellets: (1) hold the Pellets on the vessels until payment was made or (2) conditionally deliver the Pellets to Pinney Dock. *4,885 Bags of Linseed*, 66 U.S. at 112–15, 66 U.S. 108.

▮▮▮▮ Seaway contends that it conditionally delivered the Pellets. To prove that the Pellets were conditionally delivered at Pinney Dock, Seaway must provide clear evidence that the parties intended the delivery to be conditional, that it needed to discharge the Pellets immediately, that it needed to discharge the Pellets so that WCI could inspect them or that the discharge was for the convenience of both parties. See *Id.* at 114, 66 U.S. 108; *Atlantic Richfield Co.*, 604 F.2d at 872–73. Seaway argues that the liens should survive the discharge of the Pellets because such was the intention of the parties.

In attempting to prove this theory, Seaway relies primarily on *Arochem Corp. v. Wilomi, Inc.*, 962 F.2d 496 (5th Cir.1992) and *Eagle Marine Transport Co. v. A Cargo of Hardwood Chips*, No. 98–1919, 1998 WL 382141, 1998 U.S. Dist. LEXIS 10547 (E.D.La., Jul. 8, 1998). These cases are distinguishable from the instant case.

In *Arochem*, the contract required payment for the cargo to be made after delivery of the cargo. By providing a payment date after the date of delivery, the Fifth Circuit Court of Appeals held that the parties intended for the lien to survive the discharge from the vessel. Otherwise, the lien would be futile. *Arochem*, 962 F.2d at 500. In comparison, in the instant case, payment was pegged to five days after the date the shipment was loaded, not the date it was delivered. Payment could have been made before the delivery of the Pellets.[14] Since payment could have been made before or contemporaneously with delivery of the Pellets, there is no clear inference, as in *Arochem*, that the parties intended the maritime lien to survive the discharge of the Pellets.

*Eagle Marine Transport Co.* is also distinguishable. In that case, the parties con-

---

**14.** Seaway contends that the average elapsed time from completion of loading and completion of delivery was 4.67 days. (Seaway's Reply Brief at 2.) By this admission, the date of delivery and the date that payment should be made would coincide on the same day. This bolsters the argument that Seaway's remedy was to withhold delivery if payment was not timely made and, thus, retain its possessory lien.

tracted for payment of freight charges to be made within 30 days from the receipt of the invoice. Both parties understood that this would occur after delivery of the cargo, usually 16 to 19 days later. In the instant case, payment was not required after delivery and there is no evidence that the parties intended payment to occur after delivery, as was the situation in *Eagle Marine Transport Co.*

Seaway's Notices of Liens is the only evidence that the discharge of the Pellets was conditional. As set forth above, the timing of such notices is suspect as they appear to be merely an attempt to gain an advantage as a secured creditor in WCI's bankruptcy. Moreover, these notices were not contemporaneous with the discharge of the cargo, but were created days later after WCI had filed for bankruptcy protection. There is no other indication that the parties intended the Pellets to be conditionally discharged at Pinney Dock. Nor is there any indication that Seaway needed to immediately discharge the Pellets, that the Pellets were discharged so that WCI could inspect them or that the Pellets were discharged for the convenience of both parties. As a consequence, this Court finds that none of these factors exist.

Seaway (1) discharged the Pellets before receiving payment, (2) unconditionally discharged the Pellets, and (3) failed to contract with WCI to hold a nonpossessory lien on the Pellets. Accordingly, Seaway relinquished the maritime lien that it held on the Pellets upon discharge thereof. As a result, Seaway does not have a valid nonpossessory maritime lien on the Pellets under the law of the United States.

### C.  *Unjust Enrichment*

To recover for unjust enrichment, a plaintiff must prove: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of such a benefit; and (3) defendant retained the benefit under circumstances that would be unjust to do so without payment. *Andersons, Inc. v. Consol., Inc.*, 348 F.3d 496, 501 (6th Cir.2003). It is well established in common law that a party may be compelled to pay money that it has belonging to another by an action for money had and received. See *Mandeville & Jameson v. Joseph Riddle & Co.*, 1 Cranch 290, 5 U.S. 290, 2 L.Ed. 112 (1803).

In the instant case, Seaway refused to continue to provide transport service for WCI unless WCI paid a portion of the amount of the contested liens. As a result, WCI sought and obtained authority of this Court to make such payments, subject to WCI's right to contest the validity and amount of the purported liens. WCI's payment, pursuant to the Adequate Protection Order of this Court dated October 2, 2003, conferred upon Seaway the benefit of One Hundred Thousand Dollars ($100,-000.00).[15] Thus, the first element is satisfied.

The second element of the test is satisfied because Seaway received a copy of the Adequate Protection Order, is an interested party in this bankruptcy proceeding, and actually received the payment of One Hundred Thousand Dollars ($100,000.00).

Finally, it is unjust for Seaway to retain this One Hundred Thousand Dollar ($100,-000.00) payment. The Adequate Protection Order specifically states: "[n]othing in this Order shall be construed as (a) prejudicing the rights of the Debtors or any

---

**15.** The Adequate Protection Order authorized WCI to pay three monthly installments of One Hundred Thousand Dollars ($100,000.00) beginning on or before October 31, 2003 and a

final payment of One Hundred Five Thousand Five Hundred Sixty–Eight and 45/100 Dollars ($105,568.45) on or about January 31, 2004.

party in interest to dispute or contest the amount or validity of Seaway's Maritime Claim and/or the amount, validity and priority of its Maritime Lien[.]" (Adequate Protection Order ¶ 6.) Therefore, the One Hundred Thousand Dollar ($100,000.00) payment was paid and received with both parties aware that the liens asserted by Seaway might be invalidated. By the express terms of the Adequate Protection Order, WCI made the payment to Seaway of One Hundred Thousand Dollars ($100,-000.00) with a reservation of rights. This payment was always subject to being recouped. Seaway's argument that the payment was voluntary is unavailing. Without a valid maritime lien, Seaway holds only a general unsecured claim. Nothing in the Adequate Protection Order permits WCI to pay—or Seaway to retain—payment on a prepetition general unsecured claim. Since the lien is invalid, the payment constitutes a preferential and inequitable payment to Seaway on an otherwise prepetition general unsecured claim. As a result, invalidation of the lien requires that WCI be allowed to recoup the payment it made against the purported lien under the Adequate Protection Order. To allow Seaway to keep such payment would be unjust.

Therefore, Seaway is holding money "had and received" that belongs to WCI's bankruptcy estate. Seaway has no right to retain this money. Seaway has been unjustly enriched by WCI's One Hundred Thousand Dollar ($100,000.00) payment and must return such money to WCI.

## V. *CONCLUSION*

Viewing the evidence and its inferences in the light most favorable to Seaway, the Court has reached the following conclusions: Canadian law governs this dispute as dictated by the Contract and Bill of Lading. Seaway does not have valid maritime liens over the Pellets pursuant to Canadian law. Even if the law of the United States was applied, this Court would reach the same result. Seaway was unjustly enriched in the amount of One Hundred Thousand Dollars ($100,000.00) by WCI's payment made pursuant to the October 2, 2003 Adequate Protection Order.

Accordingly, Seaway's motion for summary judgment is hereby denied and WCI's cross motion for summary judgment is hereby granted. Seaway is required to return to WCI the One Hundred Thousand Dollar ($100,000.00) payment made pursuant to the aforementioned Adequate Protection Order.

An appropriate order will enter.

## ORDER

For the reasons set forth in this Court's Memorandum Opinion entered this date, Seaway's motion for summary judgment is hereby denied and WCI's cross motion for summary judgment is hereby granted. Seaway does not have valid maritime liens on the Pellets pursuant to Canadian law. Seaway was unjustly enriched in the amount of One Hundred Thousand Dollars ($100,000.00) by WCI's payment made pursuant to the October 2, 2003 Adequate Protection Order. Accordingly, Seaway is hereby ordered to reimburse WCI the One Hundred Thousand Dollar ($100,000.00) payment made pursuant to the aforementioned Adequate Protection Order.

**IT IS SO ORDERED.**